**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| STRAIT SHIPBROKERS PTE. LTD., *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil Action No. 21-01946 (BAH) |
| ) | |
| ANTONY BLINKEN, ) | |
| Secretary of State, *et, al.*, ) | |
| ) | |
| Defendants. ) | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY**

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

STEPHEN M. ELLIOTT
KRISTIN A. TAYLOR
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005

*Counsel for Defendants*

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.      The International Emergency Economic Powers Act ........................................... 3

II.     Executive Order 13,846: Reimposing Certain Sanctions With Respect to Iran ................. 5

III.    State's Determinations and the Ongoing Administrative Process ....................... 7

IV.     Plaintiffs' Complaint and Pending Motion for Relief ........................................ 9

LEGAL STANDARD ......................................................................................................... 10

ARGUMENT ...................................................................................................................... 11

I.      Plaintiffs have Not Established a Likelihood of Success on the Merits ........................ 11

        A.      Plaintiffs Are Not Likely To Succeed on Their APA Claim ................................ 11

        B.      Plaintiffs Are Not Likely To Succeed on Their Due Process Claim .................... 16

                1.      Plaintiffs Fail to Establish Sufficient Connections to the United
                        States ........................................................................................... 17

                2.      Plaintiffs' Fifth Amendment Due Process Arguments Otherwise
                        Fail On the Merits ........................................................................ 19

        C.      Plaintiffs Do Not Address Their Claim Seeking a Writ of Mandamus ................ 24

II.     Plaintiffs Fail to Demonstrate there is a Likelihood of Irreparable Harm in the
        Absence of Preliminary Relief ......................................................................... 26

III.    The Balance of Equities and the Public Interest Strongly Favor the Government ........... 33

IV.     Plaintiffs' Request for Expedited Production of the Administrative Record Is
        Moot ................................................................................................................ 35

CONCLUSION .................................................................................................................... 37

i

# TABLE OF AUTHORITIES

## CASES

*32 County Sovereignty Committee v. Department of State*,
  292 F.3d 797 (D.C. Cir. 2002) ............................................................ 17, 18

*AARP v. U.S. Equal Empt. Opportunity Comm'n*,
  226 F. Supp. 3d 7 (D.D.C. 2016) .............................................................. 33

*Airmotive Eng'g Corp. v. FAA*,
  882 F.3d 1157 (D.C. Cir. 2018) ........................................................... 13, 16

*Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*,
  686 F.3d 965 (9th Cir. 2012) ................................................................... 22

*Am. Ass'n of Political Consultants v. U.S. Small Bus. Admin.*,
  --- F. Supp. 3d --- , 2020 WL 19355256 (D.D.C. Apr. 21, 2020), *aff'd*,
  810 F. App'x 8 (D.C. Cir. 2020) ............................................................... 26

*Am. Bioscience, Inc. v. Thompson*,
  269 F.3d 1077 (D.C. Cir. 2001) ............................................................... 36

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ................................................................. 24

*Am. Immigration Lawyers Ass'n v. Reno*,
  18 F. Supp. 2d 38 (D.D.C. 1998) .............................................................. 19

*Am. Mfrs. Mut. Ins. Co. v. Sullivan*,
  526 U.S. 40 (1999) ................................................................................. 17

*Aviles-Wynkoop v. Neal*,
  978 F. Supp. 2d 15 (D.D.C. 2013) ....................................................... 26, 30

*Budhathoki v. Nielsen*,
  898 F.3d 504 (5th Cir. 2018) ................................................................... 36

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) ........................................................... 30

*Camp v. Pitts*,
  411 U.S. 138 (1973) ............................................................................... 36

*Cardinal Health, Inc. v. Holder*,
  846 F. Supp. 2d 203 (D.D.C. 2012) ........................................................... 27

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ...................................................................... 11, 12, 36

*CityFed Fin. Corp. v. Office of Thrift Supervision*,
   58 F.3d 738 (D.C. Cir. 1995) ........................................................................................ 26

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) ...................................................................................... 10

*Comm. in Solidarity with People of El Sal. v. Sessions*,
   929 F.2d 742 (D.C. Cir. 1991) ...................................................................................... 26

*Cornish v. Dudas*,
   540 F. Supp. 2d 61 (D.D.C. 2008) .......................................................................... 26, 30

*Dames & Moore v. Regan*,
   453 U.S. 654 (1981) ...................................................................................................... 3, 34

*Def. Distributed v. U.S. Dep't of State*,
   838 F.3d 451 (5th Cir. 2016) ........................................................................................ 35

*Deripaska v. Yellen*,
   Civ. Case No. 19-00727 (APM), 2021 WL 2417425 (D.D.C. June 13, 2021),
   *appeal filed*, No. 21-5157 (D.C. Cir. June 8, 2021) .................................................. 18

*Dist. of Columbia v. U.S. Dep't of Agric.*,
   444 F. Supp. 3d 15 (2020), *appeal dismised*, 2020 WL 9596420 (D.C. Cir. Nov. 5, 2020) .... 10

*Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury Office of Foreign Assets Control*,
   857 F.3d 913 (D.C. Cir. 2017) ...................................................................................... 13

*Exxon Corp. v. FTC*,
   589 F.2d 582 (D.C. Cir. 1978) ...................................................................................... 26

*Fares v. Smith*,
   901 F.3d 315 (D.C. Cir. 2018) ...................................................................................... 20

*FBME Bank Ltd. v. Lew*,
   209 F. Supp. 3d 299 (D.D.C. 2016) .............................................................................. 19

*FBME Bank Ltd v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015) .............................................................................. 22

*Fla. Power & Light Co. v. Lorion*,
   470 U.S. 729 (1985) ................................................................................................ 11, 36

*Garnett v. Zeilinger*,
   Case No. 17-cv-1757 (CRC), 2017 WL 8944640 (D.D.C. Dec. 15, 2017) .............................. 36

*Gilbert v. Homar*,
   520 U.S. 924 (1997) ................................................................................................ 20, 23

*Guttenberg v. Emery*,
    26 F. Supp. 3d 88 (D.D.C. 2014) .......................................................................... 26

*Hamandi v. Chertoff*,
    550 F. Supp. 2d 46 (D.D.C. 2008) ......................................................................... 25

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) .............................................................................................. 12, 35

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    219 F. Supp. 2d 57 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003) ......... 12, 34

*Holy Land Found. for Relief & Dev. v. Ashcroft*,
    333 F.3d 156 (D.C. Cir. 2003) ............................................................................ 13, 22

*Hubbard v. United States*,
    496 F. Supp. 2d 194 (D.D.C. 2007) ....................................................................... 27

*In re Medicare Reimbursement Litig.*,
    414 F.3d 7 (D.C. Cir. 2005) .................................................................................. 25

*In re Navy Chaplaincy*,
    738 F.3d 425 (D.C. Cir. 2013) .............................................................................. 11

*In re United Mine Workers of Am. Int'l Union*,
    190 F.3d 545 (D.C. Cir. 1999) .............................................................................. 24

*Islamic Am. Relief Agency v. Gonzales*,
    477 F.3d 728 (D.C. Cir. 2007) .............................................................................. 12

*Jifry v. FAA*,
    370 F.3d 1174 (D.C. Cir. 2004) ........................................................................ 17, 22

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    849 F.3d 1129 (D.C. Cir. 2017) ............................................................................. 26

*John Doe Co. v. Consumer Fin. Prot. Bureau*,
    235 F. Supp. 3d 194 (D.D.C. 2017) ....................................................................... 30

*Kadi v. Geither*,
    42 F. Supp. 3d 1 (D.D.C. 2012) ............................................................................ 17

*League of Women Voters v. Newby*,
    838 F.3d 1 (D.C. Cir. 2016) ....................................................................... 26, 33, 35

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .............................................................................................. 20

*Morrissey v. Brewer*,
 408 U.S. 471 (1972)............................................................................................. 20

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
 463 U.S. 29 (1983)........................................................................................ 12, 16

*Nat'l ATM Council, Inc. v. Visa Inc.*,
 Civ. Case No. 11-1803 (RJL), 2017 WL 2257327 (D.D.C. May 22, 2017)........................... 28

*Nat'l Council of Resistance of Iran v. Dep't of State*,
 251 F.3d 192 (D.C. Cir. 2001) ................................................................... 16, 17, 18

*Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*,
 Civ. No.15-01582 (APM), 2015 WL 9269401 (D.D.C. Dec. 8, 2015) .................................. 30

*Navajo Nation v. Azar*,
 302 F. Supp. 3d 429 (D.D.C. 2018) ......................................................................... 25

*Newdow v. Bush*,
 355 F. Supp. 2d 265 (D.D.C. 2005) ......................................................................... 33

*Nken v. Holder*,
 556 U.S. 418 (2009)....................................................................................... 11, 33

*Norton v. S. Utah Wilderness All.*,
 542 U.S. 55 (2004)........................................................................................... 25

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
 48 F. Supp. 3d 87 (D.D.C. 2014)............................................................................ 32

*Orvis v. Brownell*,
 345 U.S. 183 (1953)............................................................................................ 3

*Propper v. Clark*,
 337 U.S. 472 (1949)............................................................................................ 3

*Pursuing Am.'s Greatness v. Fed. Election Comm'n*,
 831 F.3d 500 (D.C. Cir. 2016)............................................................................... 33

*Rakhimov v. Gacki*,
 Civ. A. No. 19-2554 (JEB), 2020 WL 1911561 (D.D.C. Apr. 20, 2020),
 *appeal dismissed*, No. 20-5121, 2020 WL 4107145 (D.C. Cir. July 1, 2020)........................ 22

*Ralls Corp. v. Comm. on Foreign Inv. in U.S.*,
 758 F.3d 296 (D.C. Cir. 2014).......................................................................... 17, 19

*Regan v. Wald*,
 468 U.S. 222 (1984)............................................................................................ 3

v

*Safe Extensions, Inc. v. FAA*,
    509 F.3d 593 (D.C. Cir. 2007) ................................................................ 13

*Sampson v. Murray*,
    415 U.S. 61 (1974) ............................................................................ 26, 27

*Sherley v. Sebelius*,
    689 F.3d 776 (D.C. Cir. 2012) ................................................................ 10

*Singh v. Carter*,
    185 F. Supp. 3d 11 (D.D.C. 2016) .......................................................... 11

*Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*,
    --- F. Supp. 3d --- , 2021 WL 2036662 (D.D.C. May 21, 2021) ............ 28

*Strategic Env't Partners, LLC v. Bucco*,
    184 F. Supp. 3d 108 (D.N.J. 2016) .......................................................... 23

*TD Int'l, LLC v. Fleischmann*,
    639 F. Supp. 2d 46 (D.C. Cir. 2009) ........................................................ 29

*TikTok Inc. v. Trump*,
    490 F. Supp. 3d 73 (D.D.C. 2020), *subsequent determination*,
    507 F. Supp. 3d 92 (D.D.C. 2020) .......................................................... 31

*Trump v. Comm. on Oversight & Reform of U.S. House of Representatives*,
    380 F. Supp. 3d 76 (D.D.C. 2019) .......................................................... 33

*United States v. Sum of $70,990,605*,
    991 F. Supp. 2d 154 (D.D.C. 2013) ........................................................ 29

*United States v. Verdugo-Urquidez*,
    494 U.S. 259 (1990) ................................................................................ 17

*Va. Petroleum Jobbers Asso. v. Federal Power Com.*,
    259 F.2d 921 (D.C. Cir. 1958) ................................................................ 29

*Vo Van Chau v. U.S. Dep't of State*,
    891 F. Supp. 650 (D.D.C. 1995) ............................................................ 32

*Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
    559 F.2d 841 (D.C. Cir. 1977) ................................................................ 27

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ....................................................................... 10, 11, 34

*Wisc. Gas Co. v. Fed. Energy Regul. Comm'n*,
    758 F.2d 669 (D.C. Cir. 1985) ............................................... 26, 27, 29, 30

*Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*,
   750 F. Supp. 2d 150 (D.D.C. 2010) ........................................................................ 12

*Zevallos v. Obama*,
   10 F. Supp. 3d 111 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015) ........................ 12, 13

*Zevallos v. Obama*,
   793 F.3d 106 (D.C. Cir. 2015) .................................................................... 12, 20, 23

**STATUTES**

5 U.S.C. § 702 ........................................................................................................ 35

5 U.S.C. § 706 ................................................................................................... 11, 36

28 U.S.C. § 1361 ...................................................................................................... 24

50 U.S.C. § 1701 ....................................................................................................... 4

50 U.S.C. § 1702 ............................................................................................... *passim*

50 U.S.C. §§ 1701-1706 ............................................................................................. 1

50 U.S.C.A. § 4305 ................................................................................................... 3

65th Cong. Ch. 106,
   40 Stat. 411, 411-16 (1917) (codified as amended at 50 U.S.C. §§ 4301-4341) ...................... 3

Uniting and Strengthening America by Providing Appropriate Tools Required to
   Intercept and Obstruct Terrorism Act of 2001,
   Pub. L. No. 107-56, 115 Stat. 272 ......................................................................... 3, 4

**REGULATION**

31 C.F.R. § 501.807 .................................................................................................. 20

**EXECUTIVE ORDERS**

Prohibiting Certain Transactions With Respect to the Development of Iranian
   Petroleum Resources,
   Exec. Order No. 12,957, 81 Fed. Reg. 14615 (Mar. 15, 1995). ................................................. 5

Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers,
   Exec. Order No. 12,978, 60 Fed. Reg. 54579 (Oct. 21, 1995) ...................................................... 4

Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to
   Commit, or Support Terrorism,
   Exec. Order No. 13,224, 66 Fed. Reg. 49079 (Sept. 23, 2001) ..................................................... 4

Blocking Property of Weapons of Mass Destruction Proliferators and Their Supports,
Exec. Order No. 13,382, 70 Fed. Reg. 38567 (June 28, 2005) .................................................. 4

Revocation of Executive Orders 13574, 13590, 13622, and 13645 With Respect to Iran,
Amendment of Executive Order 13628 With Respect to Iran, and Provision of
Implementation Authorities for Aspects of Certain Statutory Sanctions Outside the Scope
of U.S. Commitments Under the Joint Comprehensive Plan of Action of July 14, 2015,
Exec. Order No. 13,716, 81 Fed. Reg. 3693 (Jan. 16, 2016) ...................................................... 5

Reimposing Certain Sanctions with Respect to Iran,
Exec. Order No. 13,846, 83 Fed. Reg. 38939 (Aug. 16, 2018) ........................................ *passim*

**FEDERAL REGISTER NOTICE**

Notice of Department of State Sanctions Actions; Reimposing Certain Sanctions
With Respect to Iran,
86 Fed. Reg. 672 (Jan. 6, 2021) ........................................................................... *passim*

**UNITED STATES CONSTITUTION**

U.S. Const., amend V .................................................................................................... 16

**RULE**

Local Rule 7 ........................................................................................................... 21, 23

**OTHER AUTHORITIES**

S. Rep. No. 95-466 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540 ................................................. 3

## INTRODUCTION

On October 29, 2020, pursuant to (1) the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, and (2) Reimposing Certain Sanctions with Respect to Iran, Exec. Order No. 13,846, 83 Fed. Reg. 38939 (Aug. 16, 2018) ("E.O. 13,846" or "Executive Order"), among other authorities, the Secretary of State[1] sanctioned Plaintiffs Strait Shipbrokers ("the Company") and Murtuza Mustafa Munir Basrai ("Mr. Basrai") (collectively, "Plaintiffs") based on a determination that the Company knowingly, on or after November 5, 2018, engaged in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum products from Iran.  86 Fed. Reg. 672, 672 (Jan. 6, 2021); *see also* E.O. 13,846, § 3(a)(ii).  Mr. Basrai was sanctioned on the basis of his corporate officer role within the Company.  Thereafter, Treasury added Plaintiffs to the list of Specially Designated Nationals and Blocked Persons ("SDN List"), thereby implementing the blocking of their property and interests in property within U.S. jurisdiction.

Nearly a year later, after seeking administrative reconsideration of the sanctions imposed on them—but prior to the culmination of that process—Plaintiffs now challenge State's determinations and the resulting imposition of sanctions, and seek a preliminary injunction.  The Court should not grant them such extraordinary relief.

Plaintiffs' demand for such relief rests on two primary grounds.  First, Plaintiffs allege State and Treasury violated the Administrative Procedure Act ("APA") because State acted

---

[1] As Defendants Antony Blinken, Secretary of State, and Janet Yellen, Secretary of the Treasury, are sued in their official capacities, they are referred to herein, when discussing the instant suit, as part and parcel of the agencies they respectively govern, Defendant Department of State ("State") and Defendant Department of the Treasury ("Treasury" and, together with State, "Defendants").

arbitrarily and capriciously by determining that they met the criteria set forth in the Executive Order. As will be demonstrated herein, Defendants had a reasonable basis to make the determinations (as particular to Plaintiffs, the "Determinations"), particularly given the deference afforded to the Executive Branch under the APA and in the realm of national security and foreign policy. Second, Plaintiffs claim that Defendants violated the Fifth Amendment of the U.S. Constitution by denying them adequate due process prior to and after the Determinations. But Plaintiffs have not demonstrated contacts with the United States sufficient to avail themselves of the protections afforded by the Fifth Amendment. Even if those protections apply in this case, Defendants provided Plaintiffs with sufficient notice, process, and information for them to adequately challenge the Determinations both during the administrative process—which is still ongoing—and before this Court.

The remaining factors also warrant denying preliminary relief. Plaintiffs have not demonstrated irreparable harm because they have merely put forth perfunctory, conclusory, and unsupported allegations. And just as important, the balance of equities and public interest weigh heavily in Defendants' favor. The President determined that Iran continues to pose a threat to the United States and its allies, and the economic sanctions at issue in the instant case serve the national security and foreign policy interests of this country. Plaintiffs' corporate interests in certain commercial activities involving vessels transporting petroleum from Iran, some of which the Government has determined involve actions meant to be deterred by the Executive Order, pale in comparison. The motion should be denied.

## BACKGROUND

### I.     The International Emergency Economic Powers Act

For nearly its entire history, the United States has utilized economic sanctions as a critical means to protect national security and achieve foreign policy goals.  During most of the twentieth century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917.  *See* 65th Cong. Ch. 106, 40 Stat. 411, 411-16 (1917) (codified as amended at 50 U.S.C. §§ 4301-4341).  As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies.  *See* 50 U.S.C.A. § 4305(b)(1); *see also Dames & Moore v. Regan*, 453 U.S. 654, 672 (1981).  Although TWEA does not use the term "block," the authority it conveys to the Executive Branch to regulate, prevent, or prohibit transactions consistently has been interpreted to encompass the power to block or freeze an entity's property.  *See, e.g.*, *Orvis v. Brownell*, 345 U.S. 183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).  In 1977, Congress amended TWEA and enacted IEEPA.  *See* S. Rep. No. 95-466, at 1-2 (1977), *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.  IEEPA limited TWEA's application to periods of declared wars, but also extended the President's authority to declare national emergencies.  *See Regan v. Wald*, 468 U.S. 222, 227-28 (1984).  Although the broad authorities granted to the President under IEEPA remain essentially the same as those under TWEA, with certain limited exceptions, *see id.* at 228, IEEPA requires the President to declare a national emergency "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to

the national security, foreign policy, or economy of the United States," *see* 50 U.S.C. § 1701(a).

Once such a national emergency is declared, IEEPA authorizes the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . . transfer . . . of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest . . . with respect to any property, subject to the jurisdiction of the United States . . . .

*Id.* § 1702(a)(1)(B).

Pursuant to this expansive authority, and in response to a variety of declared national emergencies, presidents have imposed sanctions with respect to many countries, including Iran, Burma, and North Korea, as well as on individuals, such as narcotics traffickers, proliferators of weapons of mass destruction, and terrorists and their supporters. *See, e.g.*, Blocking Assets and Prohibiting Transactions with Significant Narcotics Traffickers, Exec. Order No. 12,978, 60 Fed. Reg. 54579 (Oct. 21, 1995) (blocking assets of persons who "play a significant role in international narcotics trafficking centered in Colombia"); Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters, Exec. Order No. 13,382, 70 Fed. Reg. 38567 (June 28, 2005) (blocking assets of persons who have engaged in transactions that have materially contributed to the proliferation of weapons of mass destruction and their supporters); Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, Exec. Order No. 13,224, 66 Fed. Reg. 49079 (Sept. 23, 2001) (blocking assets of persons determined "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten" U.S. national security).

In October 2001, Congress amended IEEPA through passage of the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct

Terrorism Act of 2001 (USA Patriot Act), Pub. L. No. 107-56, 115 Stat. 272.  Among other things, those amendments provided that, in case of judicial review of an IEEPA-based blocking designation, an agency record containing classified information "may be submitted to the reviewing court *ex parte* and *in camera*."  *See* 50 U.S.C. § 1702(c), added by Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001).

## II.     Executive Order 13,846: Reimposing Certain Sanctions With Respect to Iran

On March 15, 1995, the President issued Executive Order No. 12,957, finding "that the actions and policies of the Government of Iran constitute[d] an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and "declar[ing] a national emergency to deal with that threat."  Prohibiting Certain Transactions With Respect to the Development of Iranian Petroleum Resources, Exec. Order No. 12,957, 81 Fed. Reg. 14615 (Mar. 15, 1995).  Thereafter, on January 16, 2016, pursuant to Executive Order 13,716, the President revoked some Executive Orders issued to address the threat identified in Executive Order 12,957, thus lifting certain sanctions previously imposed on Iran.  Revocation of Executive Orders 13574, 13590, 13622, and 13645 With Respect to Iran, Amendment of Executive Order 13628 With Respect to Iran, and Provision of Implementation Authorities for Aspects of Certain Statutory Sanctions Outside the Scope of U.S. Commitments Under the Joint Comprehensive Plan of Action of July 14, 2015, Exec. Order No. 13,716, 81 Fed. Reg. 3693 (Jan. 16, 2016).  Later, on August 6, 2018, following the announcement that the United States would cease participation in the Joint Comprehensive Plan of Action, the President issued E.O. 13,846 pursuant to IEEPA as well as other statutes specified therein, and as an additional response to the national emergency declared

in Executive Order 12,957.  Through that action, the President re-imposed certain Executive Order sanctions on Iran previously lifted in 2016.  *Id.*

The Executive Order sets forth a range of sanctions authorities and implementation provisions intended "to advance the goal of applying financial pressure on the Iranian regime" to counter "the full range of the threats posed by Iran, including Iran's proliferation and development of missiles and other asymmetric and conventional weapons capabilities, its network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates[.]"  *See* E.O. 13,846, preamble.  Among other things, the Executive Order authorizes the imposition of several types of sanctions against persons—defined as individuals or entities, E.O. 13,846, § 17(*l*)—that meet a variety of criteria.

Specifically, Section 3(a) of the Executive Order authorizes the imposition of ''[m]enu-based'' sanctions relating to persons determined to have knowingly engaged in certain categories of activities, including certain transactions in Iran's automotive sector and certain types of transactions in petroleum, petroleum products, and petrochemical products from Iran.  E.O. 13,846, § 3(a).  Under Section 3(a)(ii), the Secretary of State, in consultation with the heads of certain other agencies, may impose sanctions on a person determined to have, on or after November 5, 2018, knowingly engaged in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran.  *Id.*  Following such a determination, the Secretary of State may select from a "menu" of specific sanctions and, thereafter, the heads of the relevant Executive agencies, in consultation with the Secretary of State, as appropriate, "shall take" specific actions outlined in the Executive Order to implement the sanctions selected by the Secretary of State.  *Id.* at § 4.  One such action is that the Secretary of

State shall deny a visa to, and the Secretary of Homeland Security shall exclude from the United

States, any alien that the Secretary of State determines is a corporate officer or principal of, or a

shareholder with a controlling interest in, a sanctioned person. *Id.* § 4(e). Another such action is

that the Secretary of the Treasury shall block all property and interest in property of the sanctioned

person that are or come within the United States or the possession or control of a U.S. person, *id.*

at § 5(a)(iv), and shall impose on that person's principal executive officer or officers, or other

persons performing similar functions and with similar authorities, certain sanctions as selected by

the Secretary of State. *Id.* at § 5(a)(vii).

## III.    State's Determinations and the Ongoing Administrative Process

On October 29, 2020, the Secretary of State determined that, pursuant to E.O. 13,846, the

Company knowingly, on or after November 5, 2018, engaged in a significant transaction for the

purchase, acquisition, sale, transport, or marketing of petroleum products from Iran. 86 Fed. Reg.

at 672; *see also* E.O. 13,846, § 3(a)(ii). The Secretary of State selected sanctions to impose on the

Company specified in E.O. 13,846, including the blocking of its property and interests in property,

resulting in the Company's addition by the Secretary of the Treasury to the SDN List,[2] and the

---

[2] The selected sanctions included: the prohibition of any transactions in foreign exchange that are
subject to the jurisdiction of the United States and in which Company has any interest; the
prohibition of any transfers of credit or payments between financial institutions or by, through, or
to any financial institution, to the extent that such transfers or payments are subject to the
jurisdiction of the United States and involve any interest of the Company; the blocking of all
property and interests in property that are in the United States, that hereafter come within the
United States, or that are or hereafter come within the possession or control of any United States
person of the entities, and the provision that such property and interests in property may not be
transferred, paid, exported, withdrawn, or otherwise dealt in; the prohibition of any United States
person from investing in or purchasing significant amounts of equity or debt instruments of the
entities; and the restriction or prohibition of imports of goods, technology, or services, directly or
indirectly, into the United States from the Company. 86 Fed. Reg. at 672-73.

imposition of other sanctions on the principal executive officer or officers, or persons performing similar functions and with similar authorities of the Company, as selected by the Secretary of State. 86 Fed. Reg. at 672-73.

On the same day, the Secretary of State determined that, pursuant to E.O. 13,846, Mr. Basrai was: (i) a corporate officer or principal of the Company; and (ii) a principal executive officer of the Company, or performed similar functions with similar authorities as a principal executive officer.  86 Fed. Reg. at 673; *see also* E.O. 13,846, §§ 4(e), 5(a)(vii).  The Secretary of State levied substantially the same sanctions on Mr. Basrai as those imposed on the Company, *see supra* note 2, likewise resulting in Mr. Basrai's addition to the SDN List.  Further, in relation to this Determination, visa restrictions specified in the Executive Order became applicable to any alien that the Secretary of State determined was a corporate officer or principal of, or a shareholder with a controlling interest in, the Company (*i.e.*, thus applying to Mr. Basrai).  86 Fed. Reg. at 673; *see also* E.O. 13,846, § 4(e).  State issued a press release confirming the Determinations and Treasury posted a notice on the internet addressing the imposed sanctions.  Ex. A (Oct. 29, 2020 State Press Release); Compl., Ex. 1, ECF No. 1-1.

On December 7, 2020, Plaintiffs submitted to Treasury a "petition for delisting and a request for a general license that would allow U.S. persons to engage in business with Plaintiffs throughout the delisting process."  *See* Compl. ¶ 3, ECF No. 1.  In response, State sent an explanation for the Determinations to Plaintiffs along with a questionnaire eliciting further information.  *Id.* at ¶ 4; *see* Ex. B (Jan. 29, 2021 State Questionnaire).  The rationale provided was that "Strait Shipbrokers brokered the hiring of the M/T Lady Maris from early October 2019 to early November 2019" and that "'[i]n that time, the M/T Lady Maris shipped Iranian petroleum

products to China." *Id.* State asked Plaintiffs to "[p]lease describe in detail Strait Shipbrokers'

role, if any, in this transaction." *Id.* Plaintiffs responded to the questionnaire on February 16,

2021, and, on March 17, 2021, State sent another questionnaire to Plaintiffs. Compl. ¶¶ 5-6; *see*

Ex. C (Mar. 17, 2021 State Questionnaire). Although not a basis for the Determinations, State

informed Plaintiffs that it possessed information suggesting that the Company "facilitated the

voyage of the M/T Star Sino (IMO: 9174610; previously named M/T Falcon Victory) for loading

of petroleum products in Iran in October 2019[.]" Compl. ¶ 6; Ex. C at 2. Again, State asked

Plaintiffs whether they had any role in the transportation of petroleum products originating in Iran.

*Id.* On April 2, 2021, Plaintiffs sent State further correspondence reiterating the contention that

the Company "has not conducted business relating to the M/T Lady Maris," and "did not broker

the sale of use of M/T Star Sino or M/T Falcon Victory." Compl. ¶ 7. State continues to review

and actively evaluate Plaintiffs' request for the agency to reconsider the Determinations; the Office

of Foreign Assets Control within Treasury continues to assess Plaintiffs' request for a license to

operate in the interim period while the request for reconsideration is pending

## IV.    Plaintiffs' Complaint and Pending Motion for Relief

Plaintiffs initiated the instant lawsuit on July 19, 2021, alleging four claims in the

Complaint. *See generally* Compl. First, Plaintiffs allege that Defendants failed to articulate any

explanation for the basis of State's Determinations, and thus acted arbitrarily and capriciously in

violation of the APA. *Id.* at ¶¶ 40-45. Second, Plaintiffs contend that they were deprived by

Defendants of a property and liberty interest without due process in violation of the Fifth

Amendment of the U.S. Constitution. *Id.* at ¶¶ 46-50. Third, Plaintiffs assert they are entitled to

a preliminary injunction requiring Treasury to issue a general license permitting U.S. persons to

do business with Plaintiffs while their delisting petition is pending.  *Id.* at ¶¶ 51-55.  Fourth, Plaintiffs argue that they are entitled to a writ of mandamus compelling Defendants to remove Plaintiffs from the SDN List without further delay.  *Id.* at ¶¶ 56-60.

On July 22, 2021, Plaintiffs filed a Motion for Preliminary Injunction and Expedited Discovery, arguing they are likely to succeed on the merits of their APA and due process claims. *See generally* Pls.' Mem. in Support of Mot. for Prelim. Inj. and Expedited Disc., ECF No. 5-1 ("Pls.' Mem.").

## LEGAL STANDARD

"A preliminary injunction is a stopgap measure, generally limited as to time, and intended to maintain a status quo or to preserve the relative positions of the parties until a trial on the merits can be held." *Dist. of Columbia v. U.S. Dep't of Agric.*, 444 F. Supp. 3d 1, 15 (2020) (quoting *Sherley v. Sebelius*, 689 F.3d 776, 781-82 (D.C. Cir. 2012)), *appeal dismissed*, 2020 WL 9596420 (D.C. Cir. Nov. 5, 2020).  An interim injunction is "never awarded as of right," *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004).  *See Dist. of Columbia*, 444 F. Supp. 3d at 15 (describing a preliminary injunction as an extraordinary remedy that will not be "granted unless the movant, by a clear showing, carries the burden of persuasion") (quotations and citation omitted).  A party moving for a preliminary injunction must demonstrate that "(1) they are likely to succeed on the merits, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest."  *Dist. of Columbia*, 444 F. Supp. 3d at 15 (citing *Winter*, 555 U.S. at 20).  When, as here, the Government is opposing a motion for a

preliminary injunction, the third and fourth factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).[3]

## ARGUMENT

I.      **Plaintiffs have Not Established a Likelihood of Success on the Merits**

As summarized above, Plaintiffs assert three substantive claims in the Complaint.[4]  *See* Compl. ¶¶ 40-50, 56-60.  Plaintiffs have not satisfied the high bar for preliminary relief with regard to any of these claims, as they fail to demonstrate a likelihood of success on the merits.

A.      **Plaintiffs Are Not Likely To Succeed on Their APA Claim**

When evaluating claims brought pursuant to the APA, a court reviews an agency decision based on the administrative record.  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971)).  As relevant here, a court should uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  Under this deferential standard, the agency's decision is presumed valid, and a court reviews only whether that decision "was based on a consideration of the relevant factors and whether there has been a

---

[3]  "The D.C. Circuit has, in the past, followed the 'sliding scale' approach to evaluating preliminary injunctions," meaning that a preliminary injunction can be granted if the movant makes a particularly strong showing with regard to one factor, while a lesser showing on the others.  *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016).  "The continued viability of the sliding scale approach is highly questionable, however, in light of the Supreme Court's holding in *Winter v. National Resources Defense Council*, 555 U.S. 7, 22 (2008)[.]"  *Id.* (citing *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013)), for the proposition that all four prongs of the preliminary injunction standard must be met before injunctive relief can be granted).  Regardless of which standard is applied, preliminary injunctive relief is inappropriate here.

[4]  In Count III of the Complaint, Plaintiffs also seek a preliminary injunction.  *See* Compl. ¶¶ 51-55.  Defendants take the position that the overall assessment of the instant motion for preliminary relief will determine the merits of that claim.

clear error of judgment." *Citizens to Preserve Overton Park*, 401 U.S. at 416.  An agency's decision may be deemed arbitrary and capricious only in circumstances where the agency "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or its decision "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  The Court may not "substitute its judgment for that of the agency." *Id*.  Rather, the agency's decision should be affirmed as long as it is supported by a rational basis.  *Id.*; *see also Zevallos v. Obama* 10 F. Supp. 3d 111, 118-19 (D.D.C. 2014), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015).

This deference is further heightened in cases, such as this one, that involve national security and foreign affairs.  *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007) ("[O]ur review—in an area at the intersection of national security, foreign policy, and administrative law—is extremely deferential.").  The Supreme Court has emphasized the need for courts to grant this heightened deference even when considering constitutional claims.  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010).  And the Courts have applied such heightened deference in economic sanctions cases, such as the instant case.  *See Zevallos*, 10 F. Supp. 3d at 119 (recognizing additional deference beyond that typically accorded to an agency under the APA); *Zarmach Oil Servs., Inc. v. U.S. Dep't of the Treasury*, 750 F. Supp. 2d 150, 155 (D.D.C. 2010) ("[C]ourts owe a substantial measure of 'deference to the political branches in matters of foreign policy,' including cases involving blocking orders." (citation omitted)); *Holy Land Found. for Relief & Dev. v. Ashcroft*, 219 F. Supp. 2d 57, 84 (D.D.C. 2002) ("Blocking

12

orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference."), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

Rather, "[u]nder [the arbitrary and capricious] standard, [courts] 'may reverse only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment.'" *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (citation omitted). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion," *Airmotive Eng'g Corp. v. FAA*, 882 F.3d 1157, 1159 (D.C. Cir. 2018) (citation omitted), thus "requir[ing] more than a scintilla, but . . . something less than a preponderance of the evidence," *Epsilon Elecs., Inc. v. U.S. Dep't of the Treasury Office of Foreign Assets Control*, 857 F.3d 913, 925 (D.C. Cir. 2017) (citation omitted). A court must ultimately uphold an agency's decision if "the evidence [the agency] relied upon as a whole 'adequately supports its ultimate decision.'" *Zevallos*, 10 F. Supp. 3d at 123 n.9 (citation omitted).

Here, Defendants have presented sufficient unclassified evidence to justify State's E.O. 13846 Determination regarding the Company. *See* Pls.' Mem. at 11 (claiming that "the SDN designation is unexplained"). On the same day of the Determination, Treasury posted a notice on the internet confirming State's Determination and the attendant economic sanctions, Compl., Ex. 1; the following day, State issued a press release informing the Company that it satisfied the criteria set forth in Section 3(a)(ii) of E.O. 13,846. *See* Ex. A; *see also* 86 Fed. Reg. at 672. Section 3(a)(ii) of E.O. 13,846 provides that an entity may be sanctioned if it "knowingly engaged in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum products from Iran." State put forth additional details in a later correspondence, explaining that the Company "brokered the hiring of the M/T Lady Maris from early October 2019 to early

November 2019 . . . [and] [i]n that time, the M/T Lady Maris shipped Iranian petroleum products to China."[5]  Ex. B at 1; Compl. ¶ 4; *see* Declaration of Murtuza Mustafa Munir Basrai ¶ 10, ECF No. 8 ("Basrai Decl.").

Plaintiffs' argument with regard to Mr. Basrai is even less compelling.  State determined that Mr. Basrai met the criteria articulated in, among other provisions, section 5(a)(vii) of E.O. 13,846 for being the principal executive officer of the Company, or for having performed similar functions with similar authorities as a principal executive officer.  *See* Ex. A; Compl., Ex. 2; *see also* 86 Fed. Reg. at 673.  Mr. Basrai admits in the first paragraph of his declaration that he functions as the Company's "Managing Director," *see* Basrai Decl. ¶ 1—a position that without question satisfies the definition of a "principal executive officer" or someone performing "similar functions with similar authorities"; Mr. Basrai does not protest otherwise.  Accordingly, the Government will undoubtedly prevail with regard to Mr. Basrai in the event the Company's designation withstands Plaintiffs' dubious challenge.

To briefly recap, Defendants communicated to Plaintiffs: (1) the legal basis for the Determinations; (2) the economic sanctions consequences of the Determinations; (3) the specific transaction that precipitated the Determinations (in correspondence subsequent to the Determinations between State and Plaintiffs); (4) the general date of the transaction that had been identified; (5) the specific name of the vessel that partook in that identified transaction; and (6) that

---

[5]  State subsequently provided even more information about the Company's involvement in activities covered by the Executive Order.  State explained that it possessed information "suggesting that [the Company] facilitated the voyage of the M/T Star Sino . . . for loading of petroleum products in Iran in October 2019[.]"  Ex. C at 2; Compl. ¶ 6; *see* Basrai Decl. ¶ 12. State also noted that the Company provided documentation that it "brokered the chartering of the M/T Red Dragon," a vessel that "loaded and transported Iranian petroleum products on multiple occasions between June 2019 and February 2020."  Ex. C at 2.

such identified transaction involved the acquisition or transport of Iranian petroleum products. And Plaintiffs concede that Mr. Basrai satisfies the position necessary to trigger sanctions under Section 5(a)(vii) of the Executive Order.   *See* Basrai Decl. ¶ 1.   While Plaintiffs deny any wrongdoing on the Company's part, *see* Compl. ¶¶ 5, 7; Pls.' Mem. at 11-12, Defendants plainly established the propriety of State's Determinations and the attendant sanctions, including Treasury's inclusion of Plaintiffs' on the SDN List, as well as provided Plaintiffs ample information to mount a defense.

Plaintiffs offer a fallback defense, claiming that even if they engaged in the objectionable transactions, the Company and Mr. Basrai "certainly" did not do so "'knowingly.'"   Compl. ¶¶ 45, 50; Pls.' Mem. at 12.   Plaintiffs appear to take the position that Mr. Basrai can operate his business by turning a blind eye to the types of activities covered by the Executive Order.   *See* Basrai Decl. ¶ 5 ("We do not require, nor need, cargo country of origin information to successfully act in our roles as a broker."); *id.* ("Generally, a broker does not inquire about the cargo country of origin during negotiations.").   But even if Plaintiffs established that the Company or Mr. Basrai did not have actual knowledge of the sanctionable transactions, the definition of "knowingly" in E.O. 13,846 encompasses individuals or entities that "should have known" about the sanctionable conduct.   E.O. 13,846, § 16(i).   Plaintiffs cannot avoid sanctions consequences for their actions by being willfully ignorant of business information—which they freely admit they "do not require" from their counterparties and "do[] not inquire about"—that would make them aware of the types of activities covered by the Executive Order.   *See* Basrai Decl. ¶ 5.   Otherwise, the efficacy of E.O. 13,846 in targeting the covered activities would be drastically undermined, and this significant tool for protecting U.S. national security and foreign policy interests would be diminished.

To conclude, Defendants reasonably determined that the Company and Mr. Basrai met the criteria set forth in E.O. 13,846, and therefore, Plaintiffs cannot demonstrate that Defendants violated the APA. *See Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 42-43 (holding that an agency's decision is not arbitrary or capricious if it has a rational basis); *Airmotive Eng'g Corp.*, 882 F.3d at 1159 (concluding that an agency's finding of fact are "conclusive" when "supported by substantial evidence" meaning information that "a reasonable mind might accept as adequate to support a conclusion") (citations omitted).  At the Court's convenience, Defendants will make available to the Court the classified evidentiary memorandum and supporting exhibits, without any redactions, *ex parte*, *in camera*.  *See* 50 U.S.C. § 1702(c) ("In any judicial review of a determination made under this section, if the determination was based on classified information . . . such information may be submitted to the reviewing court ex parte and in camera.").

For all of these reasons, Plaintiffs' allegations of supposed APA violations are unsupported and their APA claim is unlikely to succeed.

**B.      Plaintiffs Are Not Likely To Succeed on Their Due Process Claim**

The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  The Due Process Clause only attaches to U.S. persons and to aliens who have "entered the territory of the United States and established substantial connections with this country."  *Nat'l Council of Resistance of Iran v. Dep't of State*, 251 F.3d 192, 203 (D.C. Cir. 2001).  If this threshold condition has been satisfied, the Court will assess whether the litigants have been deprived of a life, liberty,

or property interest.[6]  *See Ralls Corp. v. Comm. on Foreign Inv. in U.S.*, 758 F.3d 296, 315 (D.C. Cir. 2014).  And if such a deprivation has been established, the Court must determine "whether the procedures used by the Government in effecting the deprivation 'comport with due process.'" *Id.* (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 59 (1999)).

### 1.       Plaintiffs Fail to Establish Sufficient Connections to the United States

"[N]on-resident aliens who have insufficient contacts with the United States are not entitled to Fifth Amendment protections."  *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004); *see also United States v. Verdugo-Urquidez*, 494 U.S. 259, 271, 273 (1990) (concluding that some constitutional protections may apply when aliens "have come within the territory of the United States and developed substantial connections with this country").  Although the D.C. Circuit has not directly addressed substantial connection claims within the context of an economic sanctions case, the Circuit's discussion of the issue in Foreign Terrorist Organization ("FTO") cases is instructive.  *Cf. Kadi v. Geither*, 42 F. Supp. 3d 1, 25-26 (D.D.C. 2012) (citing FTO cases in the substantial connections context).  In *National Council of Resistance of Iran v. Department of State*, the D.C. Circuit concluded that two Iranian organizations could bring a due process challenge because they had an "overt presence within the National Press Building in Washington, D.C." and a "claim[] [of] an interest in a small bank account." 251 F.3d at 201.  By contrast, in *32 County Sovereignty Committee v. Department of State*, the D.C. Circuit rejected the petitioners' claim to constitutional rights where they "demonstrated neither a property interest nor a presence in this country."  292 F.3d 797, 799 (D.C. Cir. 2002).

---

[6]  For purposes of this opposition, Defendants do not contest that Plaintiffs have been deprived of a property interest.

The Company, a corporation headquartered and incorporated in Singapore, *see* Compl.
¶ 16, has not established sufficient ties with the United States to be afforded Fifth Amendment
protections.  *See, e.g.*, *Nat'l Council of Resistance of Iran*, 251 F.3d at 203.  While Plaintiffs allege
that the Company "maintains substantial ongoing business connections with U.S. companies," they
do so in a single conclusory sentence.  Pls.' Mem. at 13; Basrai Decl. ¶ 7.  Indeed, Plaintiffs fail
to provide any details about the nature, context, and breadth of the Company's supposed "ongoing
business connections."  *See generally id.*; *cf. Deripaska v. Yellen*, Civ. Case No. 19-00727 (APM),
2021 WL 2417425, at *11 (D.D.C. June 13, 2021) (concluding that the plaintiff did not have
sufficient ties to this country for due process purposes despite allegations of ownership interests
in two U.S. companies and regular visits to the United States), *appealed filed*, No. 21-5157 (D.C.
Cir. June 8, 2021).  Such conclusory, unsupported allegations fail to establish any concrete contacts
with the United States, let alone sufficient contacts that could trigger Fifth Amendment protections.
*Cf. 32 County Sovereignty Comm.*, 292 F.3d at 799 (holding that an organization whose members
"personally rented post office boxes and utilized a [domestic] bank account to transmit funds"
abroad did not have "substantial connections" with the United States and therefore was not
protected by the Due Process Clause of the Fifth Amendment).  Plaintiffs suggest that the Company
has the same or similar U.S. connections as the litigants in *National Council of Resistance of Iran*.
*See* Pls.' Mem. at 13 (suggesting that the Company has "entered the territory of the United States
and established substantial connections").  But as discussed in the preceding paragraph, the two
organizations at issue in *National Council of Resistance of Iran* had an "overt presence within the
National Press Building in Washington, D.C." and a "claim[] [of] an interest in a small bank
account."  251 F.3d at 201.  Here, Plaintiffs neither allege that the Company has any physical

presence nor assert that it has bank accounts in the United States.  Thus, the Company's allegation of substantial connections falls flat.

Mr. Basrai, a foreign national living abroad, similarly lacks sufficient contacts with the United States.  *See* Compl. ¶ 48.  Plaintiffs propound a singular argument for why Mr. Basrai has adequate ties to this country—he previously entered the United States to visit his clients and conduct business.  *See* Pls.' Mem. at 13; Basrai Decl. ¶ 7.  Yet Plaintiffs do not allege that Mr. Basrai has any current connections to the United States, such as valid legal status, physical presence, or ownership of property.[7]  *See FBME Bank Ltd. v. Lew*, 209 F. Supp. 3d 299, 328 (D.D.C. 2016) ("[F]inding due process protections under these circumstances would be inconsistent with *Verdugo–Urquidez*'s requirement that the foreign entity 'come within the territory' of the United States, which suggests at least some degree of physical presence." (citation omitted)).  In short, Mr. Basrai has no connections to the United States, let alone the substantial contacts required to potentially trigger Fifth Amendment protections.  *See Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 60 n.17 (D.D.C. 1998) (holding that regular visits to family members made by persons in possession of valid tourist visas are insufficient to qualify as "substantial connections").

### 2.    Plaintiffs' Fifth Amendment Due Process Arguments Otherwise Fail On the Merits

Even assuming Plaintiffs can invoke the protections of the Fifth Amendment, the procedures they have been afforded satisfy due process.  *See Ralls Corp.*, 758 F.3d at 315 (holding

---

[7]  Mr. Basrai cannot enter this country given that State's Determination renders him ineligible to receive a visa.  *See* E.O. 13,846, § 4(e); Compl., Ex. 1; Basrai Decl. ¶ 17 (acknowledging that he does not have "the ability to even visit the United States").

that the Court must determine whether the procedures used by the Government in effecting the deprivation "comport with due process" (citation omitted)).  The courts have made clear that "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  "The essence of due process is the requirement that a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it."  *Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) (citation omitted).  In a comparable context involving the designation of a Specially Designated Narcotics Trafficker pursuant to the Foreign Narcotics Kingpin Designation Act,[8] the D.C. Circuit concluded that due process mandates only that the Government: (1) provide the plaintiff "with the unclassified evidence on which it relied to designate him[,]" (2) allow the plaintiff the opportunity "to contest the propriety and adequacy of that evidence[,]" and (3) permit the plaintiff "to continue contesting his designation by filing new delisting requests[.]"  *Zevallos*, 793 F.3d at 116-17.  These requirements have been readily met in the instant case, notwithstanding Plaintiffs' arguments to the contrary.

As previously discussed with regard to the APA claim, the Government provided Plaintiffs with unclassified information enabling them to understand the basis for the Determinations.  *See* Pls.' Mem. at 12 (alleging that that they received "no access to unclassified evidence").  The Government issued a Federal Register Notice, press release, and notice via an internet-post informing the Company about State's Determination, which included notice of the sanctions being

---

[8]  A designation under the Foreign Narcotics Kingpin Designation Act is "analogous to other Executive Branch asset-freezing designations, such as those authorized by [IEEPA]."  *Fares v. Smith*, 901 F.3d 315, 318 (D.C. Cir. 2018).  Under both schemes, a designated person is added to the SDN List.  *See id.* (citing 31 C.F.R. § 501.807(a); *Zevallos*, 793 F.3d at 110).

imposed pursuant Section 3(a)(ii) of E.O. 13,846. *See* Ex. A; Compl., Exs. 1, 2; 86 Fed. Reg. at 672-73. State's press release went on to explain that the Company "knowingly engaged in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum products from Iran." *See* Ex. A. During Plaintiffs' reconsideration engagement with State, the agency provided additional factual information, explaining that the Company "brokered the hiring of the M/T Lady Maris from early October 2019 to early November 2019 . . . [and] [i]n that time, the M/T Lady Maris shipped Iranian petroleum products to China."[9] Ex. B at 1; Compl. ¶ 4; *see also* Basrai Decl. ¶ 10. With regard to Mr. Basrai, the Federal Register Notice, press release, and internet notice collectively explained that State determined that he satisfied the criteria in, among other provisions, Section 5(a)(vii) of E.O. 13,846 for being the principal executive officer of the Company, *see* 86 Fed. Reg. at 672-73; Ex. A; Compl., Exs. 1, 2, a fact that Mr. Basrai does not contest, *see* Basrai Decl. ¶ 1 (describing his leadership position as the "the Managing Director"). And then on Thursday, August 5, 2021, Defendants provided Plaintiffs the unclassified versions of the evidentiary and supporting exhibits that established the basis for State's Determinations, which will form the factual predicate for the certified administrative record. *See* Local Rule 7(n).

To the extent Plaintiffs seek unclassified summaries of the classified basis for the Determinations, their argument fares no better. *See* Pls.' Mem at 13. The courts in this Circuit

---

[9]  As previously mentioned, State provided details about the Company's involvement in other activities covered by the Executive Order, explaining that the Company "facilitated the voyage of the M/T Star Sino . . . for loading of petroleum products in Iran in October 2019[.]" Ex. C at 2; Compl. ¶ 6; *see also* Basrai Decl. ¶ 12. State also observed that the Company provided documentation about the M/T Red Dragon, a vessel that loaded and transported Iranian petroleum products. *See* Ex. C at 2.

have consistently held that unclassified summaries generally are not required where classified information is part of an administrative record.[10]   *See, e.g.*, *Jifry*, 370 F.3d at 1183-84 (holding that the Government satisfied the notice requirements of due process by informing foreign pilots that their airmen certificates had been revoked based on the agency's determination that the pilots were a "security threat."); *Holy Land Found. for Relief & Dev.*, 333 F.3d at 164   (rejecting plaintiffs' argument "that due process prevents its designation [by Treasury] based upon classified information to which it has not had access"); *FBME Bank Ltd v. Lew*, 125 F. Supp. 3d  109, 119 n.2 (D.D.C. 2015) (concluding that, while "unclassified summaries of classified information on which an agency relied may be helpful to litigants, they are not required"); *Rakhimov v. Gacki*, Civ. A. No. 19-2554 (JEB), 2020 WL 1911561, at *7 (D.D.C. Apr. 20, 2020), *appeal dismissed*, No. 20-5121, 2020 WL 4107145 (D.C. Cir. July 1, 2020) (declining to "impose the unprecedented remedy of mandating the issuance of an unclassified summary or allowing his counsel access to classified material").

Further, the Government provided Plaintiffs with an adequate opportunity to contest the propriety of the Determinations.[11]   *See* Pls.' Mem. at 12 (arguing that that Plaintiffs received "no

---

[10]   Although the Ninth Circuit remarked, in the context of reviewing Treasury's designation of a non-profit corporation as a terrorist organization, that unclassified summaries "could provide helpful information," it did not hold that they were necessary in every instance. *See Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 983 (9th Cir. 2012) ("[A]n unclassified summary may not be possible because, in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security."); *id.* at 984 ("We agree that a case-by-case approach is proper.  As we have alluded to earlier, the proper measures in any given case will depend on a number of factors.").

[11]   Plaintiffs also assert that State declined to meet with Plaintiffs via "video or teleconference call." Pls.' Mem. at 12, 13.  State, however, held one telephone conference with Plaintiffs' counsel,

opportunity to be heard").   To begin, Plaintiffs have availed themselves of the administrative mechanism to challenge State's Determinations: presenting State with new or additional relevant information through the agency's reconsideration process.[12]   *Id.*   In the event Plaintiffs disagree with the outcome of their pending request for reconsideration, they may continue to seek their removal from the SDN List through a renewed request.   Moreover, the instant lawsuit allows Plaintiffs to challenge the sufficiency of the explanation for the Determinations, and this Court's rules set forth the relevant procedures for the review of State's decisions.   *See* Local Rule 7(n) (contemplating, in cases concerning review of administrative agency actions, creation, certification, and disclosure of an administrative record where the Government has "cited or otherwise relied upon" the record in support of or in opposition to a dispositive motion); *cf. Strategic Env't Partners, LLC v. Bucco*, 184 F. Supp. 3d 108, 127 (D.N.J. 2016) ("[W]hen a party has access to full judicial process in which it may challenge the administrative decision in question, the state has provided adequate procedural due process.") (citations omitted).

Plaintiffs are also incorrect that they were entitled to pre-deprivation notice.   *See* Pls.' Mem. at 13 ("Defendants gave no notice to Plaintiffs.").   Due process does not require advance notice of the Government's blocking of assets.   *See Zevallos*, 793 F.3d at 116 ("[W]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause.") (quoting *Gilbert*, 520 U.S. at 930).   The D.C. Circuit explained that "providing notice before blocking the assets of

_____

and thereafter simply chose to communicate with Plaintiffs by written correspondence, as Plaintiffs repeatedly acknowledge.   *See, e.g.*, *id.* at 12.

[12]   The request for reconsideration remains pending before State.

[designated persons] would create a substantial risk of asset flight." *Id.* at 116.   Accordingly, binding circuit precedent establishes that Defendants had no obligation to provide notice before State made the Determinations.

In sum, even assuming that Plaintiffs had offered proof demonstrating sufficient connections with this country to justify Fifth Amendment protections, Defendants have afforded Plaintiffs all of the due process required by the Fifth Amendment.   On this claim, therefore, Plaintiffs are unable to demonstrate a substantial likelihood of success on the merits.

### C.      Plaintiffs Do Not Address Their Claim Seeking a Writ of Mandamus

In their motion for a preliminary injunction, Plaintiffs make no mention of Count IV of the Complaint seeking a writ of mandamus.   *Compare* Pls.' Mem. at 9-17, *with* Compl. ¶¶ 56-60.   As such, Plaintiffs have *ipso facto* failed to satisfy their heavy burden of demonstrating the propriety of preliminary relief with regard to Count IV.

Regardless, Plaintiffs' attempt to obtain a writ of mandamus will undoubtedly fail. "[M]andamus is an extraordinary remedy [and courts] require similarly extraordinary circumstances to be present before [they] will interfere with an ongoing agency process." *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 549 (D.C. Cir. 1999) (internal quotations and citations omitted).   The writ of mandamus provides a mechanism "to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."   28 U.S.C. § 1361.   "To show entitlement to mandamus, [the] plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d

183, 189 (D.C. Cir. 2016).  These requirements are jurisdictional; unless all three have been satisfied, "a court must dismiss the case for lack of jurisdiction."  *Id.* (citation omitted).

Plaintiffs have not established that they can meet these conditions.  *See* Pls.' Mem. at 9-17; Compl. ¶¶ 56-60.  Putting aside the fact that Plaintiffs did not expressly invoke the Mandamus Act, *see* Compl. ¶¶ 56-60, they do not challenge the Government's failure to perform a particular duty; rather, they seek to negate State's appropriate utilization of its economic sanctions authorities.  *See, e.g.*, Compl. ¶ 1 ("This action challenges the Trump Administration's unlawful designation of both Plaintiffs . . . on or around October 29, 2020[.]"); *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004) ("The mandamus remedy … empowers a court only to compel an agency to perform a ministerial or non-discretionary act, or to take action upon a matter, without directing *how* it shall act.") (internal citation omitted) (emphasis in original).  Further, mandamus relief is available only when "there is no other adequate remedy available to the plaintiff." *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005) (citation omitted).  Because Plaintiffs challenge the propriety of the Determinations—not some hypothetical duty owed to them—the APA provides an adequate alternative remedy, and thus their attempt to seek a writ of mandamus is without merit.  *See Navajo Nation v. Azar*, 302 F. Supp. 3d 429, 436 n.4 (D.D.C. 2018) (noting that "mandamus's invariable condition" is "the absence of an alternative remedy"); *Hamandi v. Chertoff*, 550 F. Supp. 2d 46, 53 (D.D.C. 2008) ("Because the Court finds that it has jurisdiction . . . pursuant to 28 U.S.C. § 1331 and the APA, it need not reach the question of whether mandamus is available[.]")).

**II.     Plaintiffs Fail to Demonstrate there is a Likelihood of Irreparable Harm in the Absence of Preliminary Relief**

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm." *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995) (quoting *Sampson v. Murray*, 415 U.S. 61, 88 (1974)).  The harm must be "certain and great, actual and not theoretical, and so imminent that there is a clear and present need for equitable relief to prevent irreparable harm." *League of Women Voters v. Newby*, 838 F.3d 1, 7-8 (D.C. Cir. 2016) (citation and alteration omitted).

Plaintiffs have the burden to put forth sufficient evidence to satisfy this high standard.  "The movant cannot simply make 'broad conclusory statements' about the existence of harm.  Rather, [the movant] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether [the movant], in fact, faces irreparable harm[.]'" *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008)).  "Injunctions . . . will not issue to prevent injuries neither extant nor presently threatened, but only merely feared." *Comm. in Solidarity with People of El Sal. (CISPES) v. Sessions*, 929 F.2d 742, 745-46 (D.C. Cir. 1991) (quoting *Exxon Corp. v. FTC*, 589 F.2d 582, 594 (D.C. Cir. 1978)).  Neither "bare allegations" of harm, *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985), nor "unsubstantiated and conclusory assertions," *John Doe Co. v. Consumer Fin. Prot. Bureau*, 849 F.3d 1129, 1134 (D.C. Cir. 2017), are enough.  The movant instead "must submit competent evidence into the record that would permit the Court to assess whether [the movant], in fact, faces irreparable harm" if an injunction is not issued. *Guttenberg v. Emery*, 26 F. Supp. 3d 88, 102 (D.D.C. 2014) (citation and alterations omitted) (citing *Cornish*, 540 F. Supp. 2d at 65); *Am. Ass'n of Political Consultants v. U.S. Small Bus. Admin.*, --- F. Supp.

3d --- , 2020 WL 1935525, at *6 (D.D.C. Apr. 21, 2020), *aff'd*, 810 F. App'x 8 (D.C. Cir. 2020) (denying preliminary injunction based on conclusory allegations of financial harm without detailed documentation).

Moreover, it is "well settled" that economic harm "does not, in and of itself, constitute irreparable harm." *Wis. Gas Co.*, 758 F.2d at 674. "Recoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Id.* (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir.1977)). Where the harm is financial, "an insufficiency of savings or difficulties in immediately obtaining [replacement income] . . . will not support a finding of irreparable injury, however severely [it] may affect a particular individual." *Sampson*, 415 U.S. at 92 n.68.

While Plaintiffs primarily assert that they will suffer economic harm, they merely put forth theoretical outcomes resting upon vague and conclusory claims unsupported by evidence; there is no certain and great injury alleged, and certainly none imminent.[13] To begin, although Plaintiffs allege that the Company is in a "dire financial situation," Pls.' Mem. at 14, Plaintiffs make no proffer regarding the resources—financial or otherwise—available prior to the Determinations versus those presently at the Company's disposal. Nor do Plaintiffs offer any evidence demonstrating how the Company's resources will certainly erode over time. *Cf. Cardinal Health, Inc. v. Holder*, 846 F. Supp. 2d 203, 212-13 (D.D.C. 2012) (discussing various forms of proof offered to show economic harm, including annual revenue figures and lost-sale estimates); *Hubbard v. United States*, 496 F. Supp. 2d 194, 203 (D.D.C. 2007) (finding no irreparable injury

---

[13] At the outset, Plaintiffs argue that they have been deprived of due process and therefore face irreparable harm absent preliminary relief. *See* Pls.' Mem. at 14. For the reasons discussed herein, Plaintiffs do not have a likelihood of success on their Fifth Amendment due process claim.

where the plaintiff (an attorney) "offer[ed] no explanation of the scope of his practice" but "assert[ed] that his disbarment w[ould] destroy his business.").  Although Plaintiffs also allege an impact from the Determinations to the Company's "reputation and professional goodwill," Basrai Decl. ¶¶ 17, 20, they offer scant evidence in support of that claim.  Indeed, a single exhibit attached to the Basrai Declaration indicates that at most two customers have ceased dealing with the Company, *see* Basrai Decl. ¶ 18, Ex. B, and the Declaration of Ooi Yen Yong ambiguously references the loss of a "few customers."  Declaration of Ooi Yen Yong ¶ 4, ECF No. 5-4 ("Yong Decl.").  Despite one of the Company's employees expressing a "belief" that customers stopped corresponding with the Company due to State's Determination, Yong Decl. ¶ 3, little to no evidence from actual customers supports that belief.  *See generally* Basrai Decl., Yong Decl.  Limited proof such as this cannot withstand Plaintiffs' evidentiary burden.  *See Nat'l ATM Council, Inc. v. Visa Inc.*, Civ. Case No. 11-1803 (RJL), 2017 WL 2257327, at *4 (D.D.C. May 22, 2017) (finding that the plaintiffs' affidavits, at least one of which rested upon a "belie[f]" regarding a principal reason for a decline, were "nothing more than conclusory and speculative statements" insufficient to support a finding of irreparable harm).

Similarly, Plaintiffs put forth a half-hearted, single-paragraph argument that the Determinations "deprived the Company of its property" and "other rights."  Pls.' Mem. at 15.  But Plaintiffs support these bald assertions with absolutely no evidence or citations to the Complaint.  *See id*.  They neither identify any property from which they have been deprived nor provide any other pertinent details.  *See id*.; *cf. Standing Rock Sioux Tribe v. U.S. Army Corps of Eng'rs*, --- F. Supp. 3d --- , 2021 WL 2036662, at *7 (D.D.C. May 21, 2021) (noting that a movant for injunctive relief must substantiate a claim of irreparable harm, and that "a court . . . requires affirmative

'proof' of likelihood and imminence.") (quoting *Wisc. Gas Co.*, 758 F.2d at 674).   Regarding Plaintiffs' general complaints about being denied access to U.S. capital markets and financial institutions, *see* Pls.' Mem. at 15, they cannot establish irreparable harm based on the consequences of the economic sanctions levied against them because of their decision to engage in sanctionable activities.   Indeed, although Plaintiffs assert that Citibank blocked the Company's account in Singapore because of their inclusion on the SDN List, *see* Compl. ¶ 2, Basrai Decl. ¶18 ("Citibank has closed our bank accounts"), appropriate compliance measures undertaken by a U.S. financial institution in accordance with U.S. law cannot establish irreparable harm.   *See United States v. Sum of $70,990,605*, 991 F. Supp. 2d 154, 162 (D.D.C. 2013) ("While releasing the defendant funds may affect the functioning of their business, the claimants have already failed to demonstrate that they are entitled to this relief.").   In addition, the properly blocked funds at a U.S. financial institution should be insufficient to establish irreparable harm because Plaintiffs' funds are only temporarily frozen during the pendency of their inclusion on the SDN List, and may be released in the event the Government deems it appropriate to remove Plaintiffs from the SDN List or they succeed on the merits of their claims.   *Cf. Va. Petroleum Jobbers Ass'n v. Federal Power Com.*, 259 F.2d 921, 925 (D.C. Cir. 1958) ("The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.").   Further, as previously discussed, Plaintiffs have neither proven nor even alleged how the blocked funds impact the Company's existence or create harm that is irreparable.   *Cf. TD Int'l, LLC v. Fleischmann*, 639 F. Supp. 2d 46, 49 (D.D.C. 2009) ("Indeed, the mere existence of an equitable interest in the funds is not enough on its own to warrant injunctive relief.   To the contrary, [the plaintiff] must demonstrate that the likely loss of

these funds threatens its business's very existence . . . While an equitable interest is necessary . . . to obtain an injunction to freeze assets, it is not a sufficient basis, alone, to warrant an injunction that does so.").

Moreover, there is also no explanation, let alone proof, of how the Company operated prior to the Determinations versus after, meaning Plaintiffs wholly failed to demonstrate the connection between the Determinations and the harms alleged by Plaintiffs. The same absence of proof dooms Plaintiffs' allegation that the Determinations "deprived . . . Strait Shipbrokers of its . . . relationships with shareholders," *see* Basrai Decl. ¶ 17, as the Company's investor relationships are not outlined, and Plaintiffs offer no evidence regarding such relationships. Thus, on whole, Plaintiffs entirely rely on "broad conclusory statements" and fail to offer any "competent evidence into the record" permitting an evaluation of whether they face irreparable harm. *See Aviles-Wynkoop*, 978 F. Supp. 2d at 21 (quoting *Cornish*, 540 F. Supp. 2d at 65); *see also Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 176 (D.D.C. 2018) (noting irreparable harm proffers were conclusory); *Nat'l Parks Conservation Ass'n v. U.S. Forest Serv.*, Civ. No.15-01582 (APM), 2015 WL 9269401, at *3 (D.D.C. Dec. 8, 2015) (same); *John Doe Co. v. Consumer Fin. Prot. Bureau*, 235 F. Supp. 3d 194, 204 (D.D.C. 2017) ("Plaintiff's publication claims are conclusory because they are supported only by overgeneralized statements rather than empirical examples or, for that matter, any data."). Even were the Court to assume the likelihood of all of Plaintiffs' allegations, it would be insufficient to justify a finding of irreparable harm, as "[b]are allegations of what is likely to occur are of no value since the court must decide whether the harm will *in fact* occur." *Wisc. Gas Co.*, 758 F.2d at 674 (emphasis in original).

The only evidence discussed by Plaintiffs in their memorandum to demonstrate the Determinations' alleged impact on the Company involves the termination of 33 persons' employment. Pls.' Mem. at 14-15. Plaintiffs, however, offer no proof to demonstrate that the loss of such personnel is attributable to the Determinations themselves. *Id.* at 14. Nor do Plaintiffs substantiate their claim that the Company has lost an ability to recruit new employees or retain those remaining. *Id.* In fact, Plaintiffs implicitly admit that the status of the 33 persons terminated by the Company is at least in flux. *Id.* at 15 ("If Plaintiffs are not delisted promptly and without further delay, *the Company will cease to exist, resulting in* the loss of jobs of at least 33 people") (emphasis added). In addition, even were such employees permanently severed from the company, Plaintiffs offer no proof that such workforce provided skills and talents so unique that their absence would irreparably weaken the company. Contrast this total absence of allegation or proof with the scenario in *TikTok Inc. v. Trump*, 490 F. Supp. 3d 73 (D.D.C. 2020), *subsequent determination*, 507 F. Supp. 3d 92 (D.D.C. 2020), on which Plaintiffs solely rely to argue that the Determinations irreparably injured Plaintiffs' "ability 'to recruit and retain employees to build—or even maintain—its business.'" Pls.' Mem. at 14 (quoting *TikTok*, 507 F. Supp. 3d at 113). In that case—which involved a challenge to a designation (or prohibition) of a social media service (TikTok) under IEEPA by the U.S. Department of Commerce—the court concluded that a proven impact on hiring, among other things, supported a finding of irreparable harm. *Id.* The *TikTok* plaintiffs, however offered actual evidence that demonstrated an immediate impact to hiring and recruitment that could become persistent due to the ban, which was both explained in overview and supported by data. *See* Civ. Case No. 20-02658 (CJN), ECF No. 15-3, ¶ 26 (declaration

offering proof of fierce competition in hiring for the market at issue, as well as recent figures regarding declined offers of employment).  Similar proof is not offered here.

Plaintiffs' last claim regarding irreparable harm—that Mr. Basrai "is also facing loss of his visa allowing him to work and live in Singapore," Pls.' Mem. at 14—is likewise unsupported by either an explanation of causal nexus to the Determinations or any evidence; as with Plaintiffs' other allegations, the proffer is not even explained.  While Plaintiffs offer correspondence from State indicating that it prudentially revoked Mr. Basrai's non-immigrant visa to enter the United States, *see* Basrai Decl., Ex. A, Plaintiffs do not aver why that action could be deemed responsible for, or how it may impact, any change in Mr. Basrai's visa status in Singapore (assuming that it might).  Nor have Plaintiffs offered any proof of an imminent threat to Mr. Basrai's domicile or working status in Singapore itself, aside from Mr. Basrai's conjecture that he is "facing the loss of [his] visa, which allows [him] to work and live in Singapore."  *See* Basrai Decl. ¶ 20.  Plaintiffs also have not provided any indication of how difficult it would be to replace a Singaporean visa following a revocation of the same.  In the absence of any proof regarding a threat to Mr. Basrai's residency, Plaintiffs have wholly failed to meet their burden of demonstrating a significant, unrecoverable loss.  *Cf. Vo Van Chau v. U.S. Dep't of State*, 891 F. Supp. 650, 655-56 (D.D.C. 1995) (enjoining State from implementing a decision to refuse the processing of an immigrant visa application where evidence demonstrated irreparable harm given a cumulative effect of potential injuries, *i.e.*, an ongoing threat to health and safety, an ongoing threat of repatriation, and a strong possibility that, upon repatriation, there would be no exit visa to the United States).

Finally, Plaintiffs' lengthy delay in seeking preliminary injunctive relief "stands in stark contrast to the high bar the plaintiffs must clear to show irreparable harm."  *Open Top Sightseeing*

*USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).  "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.'"  *Id.* (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).  The Determinations occurred on October 29, 2020, yet Plaintiffs did not commence this suit until July 19, 2021.  That substantial delay highlights the speculative nature of Plaintiffs' alleged irreparable harm.  *See, e.g.*, *AARP v. U.S. Equal Empt. Opportunity Comm'n*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) (finding no irreparable harm where the final rules at issue "were promulgated in May 2016, yet [the plaintiff] waited until the end of October to file this suit").

For all of the above reasons, Plaintiffs have not established a certain and great, actual and not theoretical, and truly imminent threat of irreparable harm.  *Cf. League of Women Voters*, 838 F.3d at 7-8 (citation omitted).

## III.   The Balance of Equities and the Public Interest Strongly Favor the Government

The final two factors—the balance of equities and the public interest—merge where, as here, "the Government is the opposing party."  *Trump v. Comm. on Oversight & Reform of U.S. House of Representatives*, 380 F. Supp. 3d 76, 105 (D.D.C. 2019) (quoting *Nken*, 556 U.S. at 435); *see also Pursuing Am.'s Greatness v. Fed. Election Comm'n*, 831 F.3d 500, 511 (D.C. Cir. 2016) (Government's "harm and the public interest are one and the same, because the government's interest *is* the public interest") (emphasis in original).  Here, these factors manifestly favor the government, as the relevant public interest is reflected in IEEPA, as implemented by E.O. 13,846.

The Government relies on a series of tools to effectuate the national security and foreign policy of the United States.  An important tool at its disposal is the declaration of a national

emergency pursuant to IEEPA, as authorized by Congress, and the initiation of economic sanctions.  *See, e.g.*, *Holy Land Found.*, 219 F. Supp. 2d at 84 ("Blocking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference.").  As the Supreme Court has explained, IEEPA grants the President broad authority during times of war or declared national emergencies to "investigate, regulate, . . . prevent or prohibit . . . transactions involving . . . any property in which any foreign country or a national thereof has any interest."  *See, e.g.*, *Dames & Moore*, 453 U.S. at 663 n.2 (quoting 50 U.S.C. § 1702(a)(1)(B)).  For decades, courts have consistently accorded uniquely broad deference to sanctions programs and actions under IEEPA and related statutes and implementing authorities.  *See Winter*, 555 U.S. at 24 (acknowledging the deference owed the Executive Branch in the context of a preliminary injunction when the decision involves important national security considerations).

Further, the public has an interest in a robust, comprehensive, and varied approach to national security and foreign policy, including, when appropriate, the application of economic sanctions.  By taking action under the Executive Order and IEEPA authorities, the Government determined that Plaintiffs participated in transactions that supported activities targeted by the Executive Order and contrary to the national security of the United States.  *See* E.O. 13,846 (explaining that sanctions authorized by this Executive Order are designed "to advance the goal of applying financial pressure on the Iranian regime in pursuit of a comprehensive and lasting solution to the full range of threats posed by Iran, including Iran's proliferation and development of missiles and other asymmetric and conventional weapons capabilities, its network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic

Revolutionary Guard Corps and its surrogates"). Thus, Plaintiffs are simply incorrect that the entry of emergency injunctive relief "would have no impact on Defendants," Pls.' Mem. at 15-16; to the contrary, Defendants' efforts to use this important tool in furtherance of U.S. national security would be compromised.[14]

On the other side of the scale, Plaintiffs ask the Court to take the extreme measure of issuing a preliminary injunction for the sole purpose of allegedly preventing incremental economic loss to a private company. Pls.' Mem. at 15-16. The equities favor the national security objectives of the United States over the livelihood of one particular corporation and its employees. Thus, even if Plaintiffs established some amount of economic harm, the "weighty interests of national security and foreign affairs" squarely tip the balance of equities and public interest in favor of the Government. *Humanitarian Law Project*, 561 U.S. at 33-34; *see also Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 458-60 (5th Cir. 2016) (Government's interests in national defense and national security outweighed potential temporary infringement of plaintiffs' constitutional rights).

## IV. Plaintiffs' Request for Expedited Production of the Administrative Record Is Moot

Finally, Plaintiffs' request for "expedited discovery" appears to be moot or, at the very least, misguided. *See* Pls.' Mem. at 16-17. Initially, the APA limits courts' equitable jurisdiction by dictating what evidence courts are to evaluate in suits for nonmonetary relief by a "person suffering legal wrong because of agency action," 5 U.S.C. § 702, to "the whole record or those

---

[14] Plaintiffs also cite *League of Women Voters*, 838 F.3d at 12, for the proposition that "[t]here is generally no public interest in the perpetuation of unlawful agency action," Pls.' Mem. at 16. For all of the reasons set forth in Section I, *supra*, the actions that Plaintiffs challenge are not unlawful—and Plaintiffs cannot meet their burden to show that they are likely prevail in obtaining a judicial decision to the contrary.

parts of it cited by a party." *Id.* at § 706.  Thus, it is beyond cavil that under the APA, "the focal

point for judicial review should be the administrative record already in existence, not some new

record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per

curiam); *see also*, *e.g.*, *Fla. Power & Light Co.*, 470 U.S. at 744 (explaining that the APA provides

for review "based on the record the agency presents to the reviewing court") (citing *Citizens to*

*Preserve Overton Park*, 401 U.S. 402); *Budhathoki v. Nielsen*, 898 F.3d 504, 517 (5th Cir. 2018)

(similar); *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001) (because APA

review is limited to the administrative record, "when a party seeks review of agency action under

the APA, the district judge sits as an appellate tribunal.  The entire case on review is a question of

law.") (citation omitted).  Accordingly, Plaintiffs' citation to *Garnett v. Zeilinger*, Case No. 17-

cv-1757 (CRC), 2017 WL 8944640, at *1-2 (D.D.C. Dec. 15, 2017)—a case involving ordinary

civil discovery, as opposed to APA record review—is wholly inapt, as neither expedited discovery,

nor any discovery at all, is available in this matter.

Moreover—and more importantly—Defendants provided Plaintiffs with the unclassified

version of the relevant administrative record in conjunction with the instant filing.[15]  Accordingly,

because the relevant unclassified information —which constitutes the *only* factual development

that is warranted or permissible for the resolution of Plaintiffs' claims—has been produced,

Plaintiffs' request for the same is moot.

---

[15]  Because the challenged Determinations are based in substantial part on classified information, Defendants will lodge with the Court, on an *ex parte*, *in camera* basis, a copy of the un-redacted, classified record, at the Court's convenience.  *See* 50 U.S.C. § 1702(c).

## CONCLUSION

For the reasons stated herein, the Court should deny Plaintiffs' motion for a preliminary injunction and expedited discovery.

Respectfully submitted,


BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director


 */s/ Stephen M. Elliott*
STEPHEN M. ELLIOTT
KRISTIN A. TAYLOR
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
(202) 353-0889
stephen.m.elliott@usdoj.gov

*Counsel for Defendants*


DATED: August 5, 2021

37

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on August 5, 2021, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will send a notification to counsel of record.


/s/ Stephen M. Elliott
Stephen M. Elliott
Senior Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, D.C. 20005
(202) 353-0889
stephen.m.elliott@usdoj.gov