## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

STRAIT SHIPBROKERS PTE. LTD., *et al.*,

        Plaintiffs,

        v.

ANTONY BLINKEN, in his official capacity
as Secretary of State, *et al.*,

        Defendants.

Civil Action No. 21-1946 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

In October 2020, the Secretary of State sanctioned plaintiffs Strait Shipbrokers Pte. Ltd. and the company's Managing Director, Murtuza Mustafa Munir Basrai, for prohibited commercial transactions involving the shipment of petroleum products from Iran. The U.S. Department of Treasury's Office of Foreign Asset Control ("OFAC") then placed plaintiffs on the Specially Designated Nationals ("SDN") list. As a result, United States persons are prohibited from engaging in transactions with plaintiffs, plaintiffs' property and interests within the United States or in the control of U.S. persons are blocked, and plaintiff Basrai may not enter the United States. With their request for reconsideration of the sanctions still pending before the State Department and the administrative record in the process of declassification and appropriate redaction for disclosure, plaintiffs filed this extraordinary motion for a preliminary injunction.

Plaintiffs were informed that they were being designated for "knowingly engag[ing] in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum products from Iran," *see* Executive Order 13,846 ("E.O. 13,846") § 3(a)(ii), 83 Fed. Reg. 38,939, 38,941 (Aug. 6, 2018), and subsequently provided with details regarding the specific transactions or shipments underlying the designations. In plaintiffs' view, defendants' disclosures have fallen

1

short of providing plaintiffs with either the factual basis for their designation or a "reasoned explanation" for the government's decision-making.  Given that the administrative record is largely classified—unsurprising given that the designation was made under an executive order aimed at the threats posed by the Islamic Republic of Iran and is predicated on national security concerns—plaintiffs demand that the government nonetheless disclose the classified record to plaintiffs or, in the context of this pending motion for preliminary injunctive relief, to the Court.

Put another way, plaintiffs' motion for a preliminary injunction aims to oblige the Court, on a highly expedited basis, to check the classified work of the State Department and the intelligence agencies on which it relies based on plaintiffs' hypothesis that the classified record does not support the government's clear factual assertions.  Plaintiffs fail to meet the requirements for the extraordinary remedy of a preliminary injunction and their motion is, accordingly, denied.

I.      **BACKGROUND**

Provided below is an overview of the statutory background of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701–08, the relevant executive orders prohibiting transactions with Iran and providing sanctions for those who deal with Iran, and the factual and procedural background of this case.

A.      **International Emergency Economic Powers Act**

The United States has long used economic sanctions to prohibit transactions that threaten national security.  IEEPA grants the President authority "to deal with any unusual and extraordinary [foreign] threat" to U.S. "national security" so long as "the President declares a national emergency with respect to such threat."  50 U.S.C. § 1701(a).  The statute authorizes the President to take a range of actions to combat such a threat after declaring a national emergency, including permitting the President to:

> [R]egulate, direct and compel, nullify, void, prevent or prohibit, any . . .
> transfer . . . of, or dealing in, . . . or transactions involving, any property in
> which any foreign country or a national thereof has any interest . . . with
> respect to any property, subject to the jurisdiction of the United States[.]

*Id.* § 1702(a)(1)(B).  The President may also "empower the head of any" executive department or agency to take those actions on his behalf.  3 U.S.C. § 301.

### B.   Executive Order Regarding Sanctions Imposed on Iran

IEEPA has been invoked to impose sanctions against Iran, including sanctions aimed at cutting off the market for its petroleum products.  *See* Executive Order 12,957, 60 Fed. Reg. 14615 (Mar. 15, 1995).  In January 2016, some sanctions imposed against Iran were briefly lifted, Executive Order 13,716, 81 Fed. Reg. 3693 (Jan. 16, 2016), but, on August 6, 2018, sanctions were reimposed in Executive Order 13,846.  The sanctions imposed in the latter order are currently in effect and are applicable to this dispute.

Executive Order 13,846 provides sanctions to put "financial pressure on the Iranian regime" to oppose "Iran's proliferation and development of missiles and other asymmetric and conventional weapons capabilities, its network and campaign of regional aggression, its support for terrorist groups, and the malign activities of the Islamic Revolutionary Guard Corps and its surrogates[.]"  E.O. 13,846, preamble.  The Secretary of State, in consultation with the heads of other agencies, is authorized to impose sanctions on any person determined to have "knowingly engaged in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum or petroleum products from Iran" on or after November 5, 2018  *Id.* § 3(a)(ii).  Once the determination has been made, the Executive Order provides a "menu-based" list of sanctions for designated entities or individuals.  *Id.* §§ 4, 5.  The sanctions may include prohibiting certain transactions with or involving the interests of the sanctioned person, as well as blocking transactions involving the property and interests of the sanctioned person.  *Id.* § 5(a)(i)–(vi).

3

Similar sanctions may be imposed by the Secretary of State on principle executive officers of sanctioned entities or other persons "performing similar functions and with similar authorities." *Id.* § 5(a)(vii).  Any individual determined to be "a corporate officer or principal of, or a shareholder with a controlling interest in, a sanctioned person" shall be excluded from the United States.  *Id.* § 4(e).  Persons subject to sanctions pursuant to the Executive Order are added by OFAC to the SDN list of individuals whose assets are blocked and with whom United States persons are generally prohibited from dealing.  *See* Compl., Ex. 1 ("Oct. 29, 2020 Notice of Addition to SDN List,") at 2, 5–6, ECF 1-1; *Fares v. Smith*, 901 F.3d 315, 318 (D.C. Cir. 2018) (citing 31 C.F.R. § 501.807(a); *Zevallos v. Obama*, 793 F.3d 106, 110 (D.C. Cir. 2015)).

### C.    Factual Background

Plaintiff Strait Shipbrokers is a maritime shipbroker based in Singapore that acts as an intermediary between ship owners and cargo owners, and negotiates "freight and demurrage," Compl. ¶ 22; Declaration of Murtuza Mustafa Munir Basrai ("Basrai Decl.") ¶¶ 1, 3, ECF No. 8, "offering varied services in ship brokering of bulk petrochemicals, Veg oil, LPG, LNG, clean petroleum and crude oil," Basrai Decl. ¶ 3.  Plaintiff Basrai is the founder and serves as the "managing director" of Strait Shipbrokers, Basrai Decl. ¶¶ 1, 3, and is an Indian national residing in Singapore, *id.* ¶ 20.  In brokering cargo agreements, plaintiffs concede that they "do[] not inquire about the cargo country of origin," Basrai Decl. ¶ 5, nor do they "require specific port details where ports are relatively close together," *id.* ¶ 6, apparently leaving themselves blind to whether shipments barred under U.S. sanctions are involved in plaintiffs' deals.  Plaintiffs state matter-of-factly that they "often lack visibility" of the details of the contracts underlying the deals they are brokering, *id.* ¶ 5, a surprising concession given that they are in the business of brokering shipment of "bulk petrochemicals, . . ., clean petroleum and crude oil," *id.* ¶ 3, and are involved in shipping in "Middle East Ports," *id.* ¶ 6.

On October 29, 2020, OFAC issued a public notice that plaintiffs were designated on the SDN list.  Oct. 29, 2020 Notice of Addition to SDN List at 2, 5–6.  This public notice was followed the next day by the Secretary of State's release of a press statement regarding the determination, pursuant to section 3(a)(ii) of the Executive Order, that plaintiff Strait Shipbrokers "knowingly engaged in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum products from Iran."  Defs.' Opp'n to Pls.' Mot. for Preliminary Injunction and Expedited Discovery ("Defs.' Opp'n"), Ex. A ("Oct. 30, 2020 Press Release"), ECF No. 16-1.  The press release further stated that plaintiff Basrai was sanctioned for being "principal executive offer of [Strait Shipbrokers], or performing similar functions and with similar authorities as a principle executive officer, for purposes of Section 5(a)(vii) of E.O. 13846."  *Id.*

Notice of these sanctions was published, on January 6, 2021, in the Federal Register with additional description of the range of "menu-based" sanctions imposed on plaintiffs.  86 Fed. Reg. 672, 672–73 (Jan. 6, 2021).  Specifically, the Secretary imposed various sanctions on plaintiff Strait Shipbrokers, including prohibiting transactions with Straight Shipbrokers subject to the jurisdiction of the United States and blocking the company's property interests.  *Id.* at 673.  Comparable sanctions were imposed on plaintiff Basrai based on his executive role at Strait Shipbrokers, and he was also subject to visa denial and exclusion pursuant to section 4(e) of Executive Order 13,846.  *Id.*

As a result of its designation, plaintiff Strait Shipbrokers has had its Citibank bank account cancelled, its group insurance policy cancelled, and has limited ability to engage in business with United States persons, and in business more generally.  Basrai Decl. ¶¶ 17–19; *see*

*also* Compl. ¶ 1.  Plaintiffs represent that the company is in a "dire financial situation" because of the designations and the inability to obtain a general or specific license from OFAC.  Basrai Decl. ¶ 19.  The company has terminated most its personnel, *id.*, and plaintiff Basrai faces the loss of his visa to live and work in Singapore if the sanctions on him persist, *id.* ¶ 20.

On December 7, 2020, plaintiffs submitted to the Department of Treasury a "petition for delisting and a request for a general license that would allow U.S. persons to engage in business with Plaintiffs throughout the delisting process."  Compl. ¶ 3; *see also* Basrai Decl. ¶ 9.  In response, the Department of State sent a letter to plaintiffs explaining the rationale for the designation and requesting additional information to assist in review of the petition.  *See* Defs.' Opp'n, Ex. B. ("Jan. 29, 2021 Letter"), ECF No. 16-2.[1]  The letter explained that Strait Shipbrokers was designated under the Executive Order for "broker[ing] the hiring of the M/T Lady Maris from early October 2019 to early November 2019" and "[i]n that time, the M/T Lady Maris shipped Iranian petroleum products to China."  *Id.* at 1.  The letter also requested, among other things, that plaintiffs (1) explain any role Strait Shipbrokers had in that transaction, (2) describe the nature of Straight Shipbrokers' relationship with nineteen other entities, and (3) describe Strait Shipbrokers relationship with the Iranian petroleum sector and with any entities or individuals on the SDN list.  *Id.* at 1–2.

On February 16, 2021, plaintiff Basrai responded to the letter, representing that "that Strait Shipbrokers had not brokered the sale of the M/T Lady Maris, identif[ying] who [he] understood from a public records search to be the ship's owners, and explain[ing] Strait Shipbrokers had not conducted business with any of these persons or entities either."  Basrai Decl. ¶ 11 (internal quotation marks omitted).  In response, on March 17, 2021, the State

---

[1]      This letter and a subsequent letter are dated "January 29, 2020" and "March 17, 2020," but both parties agree that the letters were sent on those dates in 2021.  Compl. ¶¶ 4, 6; Defs.' Opp'n at 8–9.

Department expressed "continu[ing] to have high confidence in the evidence underlying the State Department's designation of Strait Shipbrokers pursuant to section 3(a)(ii) of Executive Order 13846." Defs.' Opp'n, Ex. C. ("March 17, 2021 Letter") at 1, ECF No. 16-3. The agency also pointed out that while plaintiffs' "response stated that Strait Shipbrokers did not broker the sale of the M/T Lady Maris, [the State Department] stated that Strait Shipbrokers was designated for its role in the chartering of the M/T Lady Maris from early October 2019 to early November 2019." *Id.* The letter further noted that plaintiffs submitted "documents showing that Strait Shipbrokers brokered the chartering of the M/T Red Dragon, a vessel owned by Vietnam Gas and Chemicals Transportation Co., for multiple voyages between September 2019 and March 2020" and that "[t]he M/T Red Dragon (IMO: 9032264) loaded and transported Iranian petroleum products on multiple occasions between June 2019 and February 2020." *Id.* The letter provided further detail that the State Department had "additional information suggesting that Strait Shipbrokers played a role in voyages that involved Iranian petroleum products," including "facilitat[ing] the voyage of the M/T Star Sino (IMO: 9174610; previously named M/T Falcon Victory) for loading of petroleum products in Iran in October 2019." *Id.* at 2. The State Department requested additional information about these transactions, including seeking clarification of the "due diligence" done with regard to the possible shipment of Iranian petroleum products and highlighting this need given plaintiffs' vague language referring to "Middle East Ports" in documents submitted in connection with the M/T Red Dragon voyage. *See id.* at 1–2.

On April 2, 2021, plaintiffs responded to this second letter, indicating that the company "has not conducted business relating to the M/T Lady Maris," and "did not broker the sale of use of M/T Star Sino or M/T Falcon Victory." Compl. ¶ 7; *see also* Basrai Decl. ¶ 13. Plaintiffs

provide no information regarding the steps they took to confirm that they had not conducted business related to any of the named ships and, in any event, emphasize that they have only "limited and rare visibility into the details of underlying charter transactions, including with respect to cargo origin and port destinations."  Basrai Decl. ¶ 15.  Plaintiffs have presented no documentary evidence relevant to these claims and provided no further description of their business practices or otherwise explained what due diligence they have done to support their denial of the State Department's factual attestations.

Plaintiffs' request for reconsideration of the State Department determination is pending, and OFAC "continues to assess Plaintiffs' request for a license to operate in the interim period while the request for reconsideration is pending."  Defs.' Opp'n at 9.

### D.    Procedural Background

Over four months after receipt of the State Department's disclosure of additional information underlying the designations in the March 17, 2021 letter, plaintiffs filed this lawsuit on July 19, 2021, alleging that the government action designating plaintiffs as SDNs under Executive Order 13,846 was arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), and violated plaintiffs' due process rights under the Fifth Amendment.  *See* Compl. ¶¶ 40–50.  Plaintiffs seek a declaratory judgment that plaintiffs' designation was unlawful and unconstitutional, *id.* at 16 ("Prayer for Relief") ¶ 2, as well as a writ of mandamus compelling defendants to delist plaintiffs, Prayer for Relief ¶ 3.

Less than a week later, on July 22, 2021, plaintiffs filed the pending motion for a preliminary injunction to enjoin "the enforcement or implementation of the United States Department of State . . . designation of Plaintiffs as "Specially Designated National[s]" and the resulting restrictions."  Pls.' Mot. for Preliminary Injunction and Expedited Discovery ("Pls.' Mot.") at 2, ECF No. 5; *see also* Compl. ¶ 52 (requesting that the Court issue a preliminary

injunction requiring OFAC to issue a license permitting United States persons to deal with plaintiffs while their delisting petition is pending), and to obtain expedited discovery of the administrative record, Pls.' Mot. at 2.  Attached to the motion were declarations of plaintiff Basrai, *id.* Ex. 1, Decl. of Murtuza Mustafa Munir Basrai, ECF No. 5-3, and another Strait Shipbrokers employee, Ooi Yen Yong, *id.* Ex. 2, Decl. of Ooi Yen Yong, ECF No. 5-4. Plaintiffs have also resubmitted the Basrai declaration with two exhibits—correspondence from the State Department regarding cancellation of his visa and correspondence from clients severing business relationships due to the SDN designations—that were omitted from the earlier filing. *See* Basrai Decl., ECF No. 8; *id.*, Ex. A ("Nov. 10, 2020 Visa Cancellation Letter"), ECF No. 8-1; *id.*, Ex. B ("Notices of Cessation of Business"), ECF No. 8-2.

The parties proposed a briefing schedule on the pending motion, which proposed schedule was adopted.  *See* Min. Order (July 23, 2021).  The government filed its opposition memorandum on August 5, 2021 along with three exhibits: (1) the October 30, 2020 press release announcing and explaining the designations; (2) the State Department's correspondence with plaintiffs from January 29, 2021; and (3) the State Department's correspondence with plaintiffs from March 17, 2021.  On that same day, defendants provided plaintiffs with the unclassified version of the relevant administrative record.  *See* Defs.' Opp'n at 36.

At the Court's request, defendants also submitted to the Court physical copies of "the unclassified versions of the evidentiary and supporting exhibits that established the basis for State's Determinations, which were released to Plaintiffs Strait Shipbrokers Pte. Ltd. and its Managing Director, Murtuza Mustafa Munir Basrai, on August 5, 2021."  Defs.' Resp. to Order of the Court Regarding Evidentiary Materials at, ECF No. 17 (internal quotation marks

omitted).[2]  This unclassified administrative record consists of (1) an action memorandum for the Secretary of State; (2) Executive Order 13,846; (3) a proposed sanctions memorandum; (4) a Federal Register notice; (5) an evidentiary memorandum supporting determinations by the Secretary of State; and (6) 24 exhibits.  The action memorandum, proposed sanctions memorandum, evidentiary memorandum, and many of the exhibits are very heavily redacted. Defendants rely on no information in the administrative record beyond Executive Order 13,846, which is, of course, publicly available.  Plaintiffs filed their reply on August 8, 2021, *see* Pls.' Reply, and their motion is now ripe for resolution.

## II.   LEGAL STANDARD

A preliminary injunction "is a stopgap measure, generally limited as to time, and intended to maintain a status quo or 'to preserve the relative positions of the parties until a trial on the merits can be held.'"  *Sherley v. Sebelius*, 689 F.3d 776, 781–82 (D.C. Cir. 2012) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  To obtain relief, the moving party must establish that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of equities" is in their "favor"; and (4) "an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 505 (D.C. Cir. 2016).  The first factor is also the "most important factor."  *Aamer v. Obama*, 742 F.3d 1023, 1038 (D.C. Cir.

---

[2]     Defendants also offered to provide to the Court *ex parte* and *in camera* the unredacted classified record, pursuant to 50 U.S.C. § 1702(c) (providing that classified information underlying an IEEPA determination "may be submitted to the reviewing court ex parte and in camera").  The classified record has not been requested by the Court for review.  As plaintiffs note, even if such judicial review of the classified record were performed, "the Court's ability to test [the agency's] factual conclusions will be limited without the Plaintiffs' aid in rebutting their factual claims and [] the deference the Court must show them will reduce the Court's role to that of a rubber stamp."  Pls.' Reply Supp. Mot. for Preliminary Injunction and Expedited Discovery ("Pls.' Reply") at 1, ECF No. 18.  Moreover, "[t]here is no need for the Court to rely upon the classified record if the government is not asking the Court to rely upon it or indicating which parts of the classified record that it should rely upon . . .."  *Id.* at 10.

2014); *see also Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must demonstrate, among other things, 'a likelihood of success on the merits.'") (quoting *Gonzales v. O Centro Espirita Beneficente União do Vegetal*, 546 U.S. 418, 428 (2006))).[3]  A preliminary injunction "is an extraordinary . . . remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion" on each of the four factors.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis omitted) (quoting 11A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, at 129–30 (2d ed. 1995)).

## III.   DISCUSSION

As a threshold matter, plaintiffs request in their motion "expedited discovery" of the "full administrative record."  Pls.' Mem. in Supp. of Mot. for Preliminary Injunction and Expedited Discovery ("Pls.' Mem.") at 16, ECF No. 5-1.  This request has morphed from a general request for the administrative record—without *any* reference to the classified information plaintiffs knew would be contained therein, *see id.* at 16–17—to a request without any relevant authority that the Court force the government "to produce the full record or to justify any redaction," Pls.' Reply at 13.  IEEPA expressly contemplates that OFAC may rely on classified information and make classified information underlying designation available "to the reviewing court *ex parte* and *in camera*."  50 U.S.C. § 1702(c).  Such classified information may be provided only to the Court.  *See Holy Land Found. for Relief and Dev. v. Ashcroft* ("*Holy Land II*"), 333 F.3d 156, 163–64 (D.C. Cir. 2003) (holding that  notice provided to the designated party "need not disclose the

---

[3]        The D.C. Circuit has previously followed a "sliding scale" approach to evaluating preliminary injunctions, but that approach is likely inconsistent with *Winter*, *see Archdiocese of Wash. v. Wash. Metro. Area. Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (observing that *Winter* may be "properly read to suggest a 'sliding scale' approach to weighing the four factors be abandoned"); *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1295–96 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (noting that "this Circuit's traditional sliding-scale approach to preliminary injunctions may be difficult to square with the Supreme Court's recent decisions in" *Winter* and *Munaf*), and therefore will not be employed here, *Singh v. Carter*, 185 F. Supp. 3d 11, 16–17 (D.D.C. 2016).

classified information to be presented *in camera* and *ex parte* to the court under the statute"). Plaintiffs' request is therefore moot since the government has already provided to plaintiffs the "unclassified version of the relevant administrative record."  *See* Defs.' Opp'n at 36 & n.15.[4]

This leaves only plaintiffs' request for a preliminary injunction.  After addressing the heightened burden plaintiffs face on their request for a mandatory preliminary injunction, plaintiffs' likelihood of success on the merits, claim of irreparable harm, and the balance of the equities and public interest are discussed *seriatim*.

### A.      Heightened Burden for Mandatory Preliminary Injunctions

Here, plaintiffs request "a preliminary injunction against the enforcement or implementation of the [Secretary of State's] designation of Plaintiffs as . . . [SDNs] and the resulting restrictions."  Pls.' Mot at 2.  The designations and accompanying sanctions, of course, were implemented almost ten months ago, and plaintiffs do not explain how their "enforcement or implementation" can be enjoined without defendants taking the step of withdrawing them or otherwise acting.  What plaintiffs really want is found in their complaint, which states that "[t]he Court should issue a preliminary injunction requiring OFAC to issue a general license permitting U.S. persons to do business with Plaintiffs while their delisting petition is pending."  Compl. ¶ 52; *see also* Pls.' Mem. at 1.

---

[4]      Plaintiffs challenge, without citation to any authority, the scope of defendants' redactions to the administrative record,  Pls.' Reply at 13, in an apparent invitation for this Court to engage, on an expedited basis, in assessing the propriety of the classification of certain information. This invitation is declined.  The scope of the government's redaction of classified information need not be addressed here both because (1) the classified administrative record is not necessary to resolve the pending motion, as this classified material is not even relied upon by defendants; and (2) the generally expedited nature of a preliminary injunction proceeding is not the appropriate context for such a classification challenge.  *See Elec. Priv. Info. Ctr. v. Dep't of Just.*, 15 F. Supp. 3d 32, 48 (D.D.C. 2014) (emphasizing, in addressing a motion for a preliminary injunction implicating classified information, the importance of "permitting [the government] to take the time it needs to conduct an adequate classification review").

Plaintiffs therefore do not seek relief to maintain the status quo, which is the typical function of a preliminary injunction. *See Sherley*, 689 F.3d at 781; *City of Moundridge v. Exxon Mobil Corp.*, 429 F. Supp. 2d 117, 126 (D.D.C. 2006) ("A motion for a preliminary injunction generally seeks to maintain the status quo[.]").  Instead, they request a mandatory injunction to alter rather than preserve the status quo by compelling, without a clear end date, the relief they seek in their complaint. *See* Prayer for Relief ¶¶ 2–3.  Mandatory injunctions that "would change the status quo" are disfavored as "an even more extraordinary remedy" than the typical preliminary injunction, *Abdullah v. Bush*, 945 F. Supp. 2d 64, 67 (D.D.C. 2013), "especially when directed at the United States Government," *Sierra Club v. Johnson*, 374 F. Supp. 2d 30, 33 (D.D.C. 2005); *see also Mylan Pharms., Inc. v. Shalala*, 81 F. Supp. 2d 30, 36 (D.D.C. 2000) ("In this Circuit, 'the power to issue a preliminary injunction, especially a mandatory one, should be sparingly exercised.'") (quoting *Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969)).

"Plaintiffs seeking this type of relief . . . face 'an additional hurdle' when proving their entitlement to relief," *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 901 F. Supp. 2d 54, 56–57 (D.D.C. 2012) (quoting *King v. Leavitt*, 475 F. Supp. 2d 67, 71 (D.D.C. 2007)), and courts "exercise extreme caution in assessing" such motions, *id.* at 57. Indeed, "[a]s a rule, '[w]hen a mandatory preliminary injunction is requested, the district court should deny such relief unless the facts and law clearly favor the moving party.'" *Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo-Mitsubishi Ltd.*, 15 F. Supp. 2d 1, 4 (D.D.C. 1997) (second alteration in original) (emphasis omitted) (some internal quotation marks omitted) (quoting *Phillip v. Fairfield Univ.*, 118 F.3d 131, 133 (2d Cir. 1997)).  Set against "the demanding standard for a mandatory preliminary injunction," *Archdiocese of Wash. v. Wash.*

*Metro. Area Transit Auth.*, 897 F.3d 314, 319 (D.C. Cir. 2018), plaintiffs face a high hurdle that they fail to overcome.

### B.     Likelihood of Success on the Merits

Plaintiffs assert a likelihood of success on the merits of both their APA and due process claims in the pending motion.  Each is discussed in turn.

#### 1.     *APA Claim*

Plaintiffs argue that they are likely to prevail on their APA claim that defendants' designation of Strait Shipbrokers under Executive Order 13,846 was arbitrary and capricious because (1) "the SDN designation is unexplained" and (2) "the SDN designation is . . . not supported by substantial evidence."  Pls.' Mem. at 11 (internal quotation marks omitted).[5] Defendants contend—pointing to the October 30 press release, the Federal Register notice, and the subsequent correspondence with plaintiffs—that the unclassified record sufficiently supports the Department of State's determination that Strait Shipbrokers met the criteria of section 3(a)(ii) of Executive Order 13,846.  Defs.' Opp'n at 13.

In reviewing a claim under the judicial review provisions of the APA, the reviewing court will uphold an agency decision unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]"  5 U.S.C. § 706(2)(A).  This is a "highly deferential standard.'"  *Zevallos*, 793 F.3d at 112 (quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).  The reviewing court "may not substitute [its] judgment for [the agency's]," but must require only that the agency "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and

---

[5]     The parties' dispute hinges on the designation of Strait Shipbrokers.  As defendants observe, plaintiff Basrai's designation under section 5(a)(v)(ii) of Executive Order 13,846 was predicated on his role as the principle executive officer of Strait Shipbrokers, *see* 86 Fed. Reg. at 673, which plaintiffs do not contest, *see generally* Pls.' Reply; *see also* Basrai Decl. ¶ 1 (identifying Basrai as the "Managing Director of Strait Shipbrokers").

the choice made." *Id.* (quoting *Islamic Am. Relief Agency*, 477 F.3d at 732).  The agency's decision will only be reversed if it "is not supported by substantial evidence, or the agency has made a clear error in judgment."  *Spirit Airlines, Inc. v. U.S. Dep't of Trans.*, 997 F.3d 1247, 1255 (D.C. Cir. 2021) (quoting *J.A. Jones Mgmt. Servs. v. FAA*, 225 F.3d 761, 764 (D.C. Cir. 2000)).  "The 'substantial evidence' standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence."  *FPL Energy Me. Hydro LLC v. FERC*, 287 F.3d 1151, 1160 (D.C. Cir. 2002).

Deference for agency decision-making is heightened in the context of executive blocking decisions, which lie "at the intersection of national security, foreign policy, and administrative law."  *Islamic Am. Relief Agency*, 477 F.3d at 734; *see also Olivares v. TSA*, 819 F.3d 454, 462 (D.C. Cir. 2016) ("[W]e defer to the informed judgment of agency officials whose obligation it is to assess risks to national security.").

Plaintiffs' first argument—that the SDN designations were "unexplained" and therefore arbitrary and capricious—has no merit.  The day after the designations were made, the State Department issued a press release indicating that plaintiff Strait Shipbrokers had been sanctioned, pursuant to section 3(a)(ii) of Executive Order 13,846, for "knowingly engag[ing] in a significant transaction for the purchase, acquisition, sale, transport, or marketing of petroleum products from Iran" and that plaintiff Basrai was being sanctioned as a principal officer pursuant to section 5(a)(vii) of Executive Order 13,846.  October 30, 2020 Press Release at 2.  Plaintiffs do not support their assertion that defendants must do more at the time of designation than (1) provide the authority for the designations and (2) generally describe the conduct that prompted the designations.  Put another way, defendants need not immediately turn over the entire administrative record on or around the date of designation.  Moreover, as plaintiffs concede, they

were soon provided with more specific information regarding the precise transaction on which

the designations were predicated and then given the opportunity to engage with the State

Department on the accuracy of the information underlying the designation.  *See* Jan. 29, 2021

Letter at 1; March 17, 2021 Letter at 1–2.

Plaintiffs next challenge the factual basis for the designation.  Plaintiffs assert that

"[t]here is no basis for any suggestion that Plaintiffs engaged in a transaction for the purchase,

acquisition, sale, transport, or marketing of petroleum products from Iran."  Pls.' Mem. at 12.

They further deny having "conducted business with [the ships named in correspondence with the

State Department] and certainly have not 'knowingly' done so."  *Id.*  On that basis—and

ignoring that they do not have access to the classified record—plaintiffs contend that the

designations "run counter to any accurate evidence before the agency."  *Id.*

Defendants argue that they have presented enough unclassified information to support the

State Department's designation under Executive Order 13,846.  Defs.' Opp'n at 13.  In

defendants' view, the statements regarding the basis for the designation—that Strait Shipbrokers

"brokered the hiring of the M/T Lady Maris from early October 2019 to early November 2019

. . . [and] [i]n that time, the M/T Lady Maris shipped Iranian petroleum products to China"—

provides a sufficient basis at this stage of the litigation to determine that plaintiffs are unlikely to

succeed on their APA claim.  *See* Defs.' Opp'n at 13–14, 16 (quoting Mar. 17, 2021 Letter at 1).

While defendants have not quoted, summarized, or detailed the underlying documentary or

testimonial evidence to support this factual assertion, plainly, the State Department believes that

the evidence relating to the Lady Maris warrants the actions taken.  *See* Mar. 17, 2021 Letter

(State Department stating, in responding to plaintiffs' denials, that the agency "continue[s] to

have high confidence in the evidence underlying the State Department's designation of Strait Shipbrokers pursuant to section 3(a)(ii) of Executive Order 13,846").

In arguing that they did not "knowingly" do business involving the relevant ships, plaintiffs emphasize that they "act as intermediaries between ship owners and charter parties and have limited visibility into the underlying charter transactions, including the cargo origin and port destination."  Pls.' Mem. at 11–12 (citing Basrai Decl. ¶ 4).  Plaintiffs do not clearly indicate what they know about the transactions they are brokering, but, if anything, this fact makes plaintiffs' claims *weaker* by undermining their assertion that they had nothing to do with the ships that defendants say were carrying Iranian petroleum products.  As the government points out, the Executive Order defines "knowingly" to include circumstances where a person "should have known" about the relevant conduct, circumstances, or result.  E.O. 13,846 § 16(i).  To the extent plaintiffs exercised willful blindness to the "cargo origin and port destinations," Basrai Decl. ¶ 15, while shipping oil and petrochemicals potentially subject to international sanctions, their lack of knowledge cannot shield them from responsibility for transactions involving Iranian petroleum products.

Plaintiffs bear the burden of persuasion on all factors in consideration of a motion for a preliminary injunction.  *See Sherley*, 644 F.3d at 392 (noting that "[a] preliminary injunction is 'an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief'" (quoting *Winter*, 555 U.S. at 22)).  In this case, plaintiffs have presented no documentary evidence to support their assertion that they did not engage in the conduct prohibited under Executive Order 13,846.  This is not surprising, as doing so would require them to prove a negative.  Still, plaintiffs do not inspire confidence in their denial given that they have provided no information or evidence regarding the *basis* for the denials that they were involved

17

in any of the transactions highlighted by the State Department.  Rather, they have conceded that they broker shipment of petrochemicals and other petroleum products, Basrai Decl. ¶ 3, in "Middle East Ports," *id.* ¶ 6; Mar. 17, 2021 Letter at 2, with "limited and rare visibility" into the underlying transactions, Basrai Decl. ¶ 15.

At the same time, defendants, have also not presented evidence—beyond offering to "make available to the Court the classified evidentiary memorandum and supporting exhibits, without any redactions, *ex parte*, *in camera*," Defs.' Opp'n at 16 (citing 50 U.S.C. § 1702(c))—to support the assertion that plaintiffs actually meet the criteria for designation under section 3(a)(ii) Executive Order 13,846.  As additional information may be declassified, more evidence underlying the designation may become available, and in subsequent stages of this litigation, with different burdens on the parties, this may make a difference. At this stage, however, plaintiffs have not established a likelihood of success on the merits of their APA claim.  Given (1) the heightened standard for mandatory preliminary injunctions; (2) the extensive classified record; (3) the apparently active declassification process; (4) the ongoing engagement between plaintiffs and the State Department; and (5) the relative dearth of evidence presented by plaintiffs, the merits of the APA claim are uncertain, and defendants will not be compelled to expedite the declassification process or provide the classified record to the Court, which plaintiffs acknowledge would bypass the adversarial process.  *See supra* n.2.

A single factual dispute underlies plaintiffs' claim: whether plaintiffs knowingly engaged in transactions prohibited under Executive Order 13,846.  *Compare* Basrai Decl. ¶ 13 (stating that he told the State Department that "the Company has not conducted business relating to the M/T Lady Maris"); *with* Defs.' Opp'n at 16 (asserting that defendants "reasonably determined that the Company and Mr. Basrai met the criteria set forth in E.O. 13,846"); March 17, 2021

Letter ("We continue to have high confidence in the evidence underlying the State Department's designation of Strait Shipbrokers pursuant to section 3(a)(ii) of Executive Order 13846.").  Given the current posture of this case, as well as plaintiffs' limited support of their denial and apparent blindness to the details of their business dealings, now is not the appropriate time to resolve this factual dispute.  Plaintiffs may not take the extraordinary step of moving for a preliminary injunction to ask the Court to check the State Department's work on a highly expedited and *ex parte* basis, while declassification is apparently ongoing.[6]

Accordingly, plaintiffs have failed to demonstrate a likelihood of success on the merits of their APA claim.

### 2.    *Due Process*

In their due process claim, plaintiffs argue that defendants failed to provide them due process by (1) failing to provide plaintiffs with pre-designation notice of their SDN designations and (2) failing to provide plaintiffs with the "factual basis for their SDN designations nor the materials on which those materials were purportedly based."  Pls.' Mem. at 13.  Defendants argue that plaintiffs were not entitled to pre-designation notice, *id.* at 23, and that plaintiffs cannot complain about the post-designation opportunity to contests the designations given that they are currently participating in the reconsideration process and have been provided with relevant non-classified information, including the October 30, 2020 press release, Federal

---

[6]    Tellingly, each of the three IEEPA cases relied upon by plaintiffs, *see* Pls.' Mem. at 10, involving preliminary injunctions (1) sought to enjoin impending prohibitions that had yet to go into effect rather than force the rolling back of earlier designations; (2) did not involve classified information; and (3) did not hinge on specific factual disputes regarding the actions of the plaintiffs.  *See generally TikTok Inc. v. Trump*, 507 F. Supp. 3d 92 (D.D.C. 2020); *Luokung Tech. Corp. v. Dep't of Defense*, Case No. 21-cv-583 (RC), 2021 WL 1820265 (D.D.C. May 5, 2021); *Xiaomi Corp. v. Dep't of Defense*, Case No. 21-cv-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021).

Register notice, and subsequent communication explaining the transaction underlying the designation, *id.* at 20–23.[7]

In considering whether an SDN designation provides constitutionally required notice and the opportunity to be heard, "courts weigh three factors under the familiar *Mathews v. Eldridge* balancing test: (1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; (3) and 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.'" *Fares v. Smith*, 901 F.3d 315, 323 (D.C. Cir. 2018) (quoting *Matthews v. Eldridge*, 424 U.S 319, 335 (1976)).   "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Plaintiffs' due process claim is unlikely to succeed on the merits.  Relevant to plaintiffs arguments on pre-deprivation notice, the D.C. Circuit has noted, in the analogous context of a "Specially Designated Narcotics Trafficker" designation pursuant to the Foreign Narcotics Kingpin Designation Act, that "[w]here a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Zevallos*, 793 F.3d at 116 (quoting *Gilbert v. Homar*, 520 U.S. 924, 930 (1997)).  In addressing international sanction and asset-blocking regimes, the D.C. Circuit has held that the risk of "asset flight" creates "a 'special need for very prompt action." *Id.* (quoting *Calero-Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 678 (1974)).  The

---

[7]     Defendants also argue that plaintiffs have "insufficient contacts with the United States [to be] entitled to Fifth Amendment protections," Defs.' Opp'n at 17 (quoting *Jifry v. FAA*, 370 F.3d 1174, 1182 (D.C. Cir. 2004)), but the merits of this argument need not be addressed because plaintiffs are otherwise unlikely to succeed on the merits of their due process claim.

government does not describe in detail the precise nature of the risk of asset flight here, but under IEEPA, "courts generally hold that OFAC need not provide pre-deprivation notice and hearing, given the government's compelling interest in the immediate blocking of assets upon designation." *Zevallos v. Obama*, 10 F. Supp. 3d 111, 127 (D.D.C. 2014) (collecting cases), *aff'd*, 793 F.3d 106 (D.C. Cir. 2015); *see also Al Haramain Islamic Found., Inc. v. U.S. Dep't of Treasury*, 686 F.3d 965, 985 (9th Cir. 2012) ("[A]s many courts have held, the potential for 'asset flight' almost certainly justifies OFAC's decision not to provide notice before freezing the assets") (citing *Holy Land II*, 333 F.3d at 163–64)).

Plaintiffs fare no better in their argument regarding post-deprivation due process.  In the context of national security sanctions and blocking orders, the D.C. Circuit has held that due process requires only that the government (1) provide plaintiff "with the unclassified evidence on which it relied to designate him"; (2) allow plaintiff the opportunity "to contest the propriety and adequacy of that evidence"; and (3) permit plaintiff "to continue contesting his designation by filing new delisting requests[.]" *Zevallos*, 793 F.3d at 116–17.[8]  The government has undoubtedly done that here, having turned over the unclassified record, *see* Pls.' Opp'n at 36; described the specific transaction underlying the designation, *see* Jan. 29, 2021 Letter at 1; and described other transactions that are of concern, *see* Mar. 17, 2021 Letter at 1–2.  Thus, not only have plaintiffs been advised of the specific alleged transactions that serve as the basis for their designations or are otherwise under scrutiny from the government, *see* Jan. 29, 2021 Letter at 1; Mar. 17, 2021 Letter at 1–2, they can and are seeking administrative reconsideration of the designations with the State Department, *see* Pls.' Mem. at 5; Defs.' Opp'n at 23.

---

[8]     The D.C. Circuit has held that "Trafficker designations under the Kingpin Act are analogous to other Executive Branch asset-freezing designations, such as those authorized by [IEEPA]." *Fares*, 901 F.3d at 318 (noting that, under each statute, designated individuals are "added to the 'Specially Designated Nationals and Blocked Persons List.'" (quoting 31 C.F.R. § 501.807(a)).

Plaintiffs raise concerns regarding the precise scope of disclosure and the possibility that the government has designated too much of the underlying record as classified. *See* Pls.' Reply at 10–11. This may be so, particularly given that the government specifically provided in its January 29, 2021 and March 17, 2021 letters assertions about plaintiffs' suspect activities that are not apparent in the declassified administrative record. The possibility that the government has classified too much of the record or is not moving sufficiently quickly in declassifying the record does not go directly to the factors laid out in *Zevallos*, however, given that the question here is simply whether the government has provided the relevant unclassified evidence to plaintiffs and given them the opportunity to respond. The request to litigate defendants' classified redactions is simply premature in this early stage of the proceedings.[9] Moreover, "[f]orcing the executive branch to disclose information that it has validly classified would compel a breach in the security which that branch is charged to protect." *Fares*, 901 F.3d at 324 (internal quotation marks and citations omitted). Thus, when evaluating claims implicating classified information at the preliminary injunction stage, courts must be mindful of the importance of "permitting [the government] to take the time it needs to conduct an adequate classification review." *Elec. Priv. Info. Ctr.*, 15 F. Supp. 3d at 48.

Plaintiffs further request unclassified summaries or access of cleared counsel to classified material, *see* Pls.' Reply at 10, 13, but these forms of access to classified material are not required. *See Al Haramain Islamic Found.*, 686 F.3d at 983 ("[A]n unclassified summary may not be possible because, in some cases, the subject matter itself may be classified and cannot be revealed without implicating national security."); *Holy Land II*, 333 F.3d at 164 (holding that the

---

[9]     As noted *supra* n.4, plaintiffs provide no support for proposition that the government must justify each and every of its classification determination, nor for the proposition that challenge to classification determinations is available in deciding a preliminary injunction.

OFAC designation process does not convey a right to access classified evidence).  Plaintiffs have

been provided sufficient information regarding the bases for their designations, and therefore

have the information necessary to meaningfully engage in the reconsideration process.

Plaintiffs have therefore failed to establish a likelihood of success on the merits of their

due process claim, with respect to both their pre-designation and post-designation due process

arguments.

### C.     Irreparable Harm

Plaintiffs meet the "high standard for irreparable injury" required for preliminary

injunction relief.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir.

2006).  To show irreparable harm, plaintiffs must demonstrate that they face an injury that is

"both certain and great," "actual . . . not theoretical," and "of such imminence that there is a clear

and present need for equitable relief to prevent irreparable harm."  *Wis. Gas Co. v. FERC*, 758

F.2d 669, 674 (D.C. Cir. 1985) (per curiam) (internal quotation marks and emphasis omitted).

Further, plaintiffs must show "the alleged harm will directly result from the action which the

[plaintiff] seeks to enjoin," as "the court must decide whether the harm will *in fact* occur."  *Id.*

(emphasis in original); *see also Winter*, 555 U.S. at 22 (rejecting "'possibility' standard [as] too

lenient," explaining "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary

relief to demonstrate that irreparable injury is likely in the absence of an injunction.") (emphasis

in original)).

Plaintiffs contend that they will suffer irreparable harm in the absence of preliminary

relief because, because "the SDN designation" has put "the Company . . . in dire financial

situation" such that the company "has had to terminate the employment of 33 personnel."  Pls.'

Mem. at 14 (citing Basrai Decl ¶ 19).  As plaintiffs point out, "courts have found irreparable

harm where the movant has made a strong showing that the economic loss would significantly

damage its business above and beyond a simple diminution in profits." *Mylan Pharms., Inc.*, 81 F. Supp. 2d at 43 (collecting cases). The government responds that plaintiffs' evidence is too conclusory and that "[r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the movant's business." *Wis. Gas Co.*, 758 F.2d at 674 (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 n.2 (D.C. Cir. 1977)); *see* Defs.' Opp'n at 27.

Plaintiffs meet the demanding standard of establishing irreparable harm on the basis of monetary loss. Plaintiffs have presented evidence—in the form of the Basrai declaration—that "all [their] clients have confirmed that they refuse to do business with [them] because of the designation," Basrai Decl. ¶ 18; *see also* Notices of Cessation of Business; that they have had to terminate or have otherwise lost over 80 percent of their employees, Basrai Decl. ¶ 19; and the company is in a "dire financial situation" as a result of the designations, *id.* Moreover, plaintiffs will be unable to recover damages against the United States if their designation is later found to be unlawful, Pls.' Reply at 11, and plaintiff Basrai is at risk of losing his visa and having to move his entire family to another country, Basrai Decl. ¶ 20.

The D.C. Circuit has expressly noted that, "[a]s a general matter, the effect of an OFAC designation on the designee's private interests is 'dire.'" *Fares*, 901 F.3d at 323. Unsurprisingly, that is the case here. Plaintiffs have demonstrated an existential risk to Strait Shipbrokers sufficient to establish irreparable injury, and defendants' arguments to the contrary are uncompelling.

### D. The Balance of Equities and Public Interest

Plaintiff has not shown that the balance of hardships and the public interest weigh in favor of injunctive relief. These factors require courts to "balance the competing claims of injury and . . . consider the effect on each party with the granting or withholding of the requested

relief," *Winter*, 555 U.S. at 24 (quoting *Amoco Production Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987)), in addition to paying "particular regard for the public consequences in employing the extraordinary remedy of injunction," *id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  Where the federal government is the opposing party, the balance of equities and public interest factors merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009).

Considering these key factors, factual challenges to SDN designations based on classified information are extraordinarily ill-suited to preliminary injunctive relief.  Plaintiffs devote almost no space in their briefing to this key issue, asserting that the threat to plaintiffs is "catastrophic" and noting that "[t]here is generally no public interest in the perpetuation of unlawful agency action."  Pls.' Mem. at 16 (quoting *League of Women Voters*, 838 F.3d at 12)).  Plaintiffs baldly claim that the granting of a preliminary injunction "would have no adverse impact on Defendants," *id.*, and that defendants "face no harm at all," Pls.' Reply at 12.  As support, plaintiffs suggest that allowing them to be delisted while these proceedings go on will be particularly low risk because of their willingness to "institute an OFAC compliance program" and conduct "due diligence on counter-parties."  *Id.*

This description of the equities and the public interest is myopic.  As the government points out, blocking orders and the imposition of economic sanctions are important national and foreign policy tools.  *See* Defs.' Opp'n at 33–34.  Actions taken pursuant to IEEPA and the Executive Order providing sanctions to parties transacting in Iran petroleum products are particularly important to national security and thus are subject to significant deference.  The "sensitive and weighty interests of national security and foreign affairs," *Holder v. Humanitarian L. Project*, 561 U.S. 1, 33–34 (2010), weigh in favor of the government given that "[b]locking orders are an important component of U.S. foreign policy, and the President's choice of this tool

to combat terrorism is entitled to particular deference," *Holy Land Found. for Relief & Dev. v. Ashcroft* ("*Holy Land I*"), 219 F. Supp. 2d 57, 84 (D.D.C. 2002), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003).

Plaintiffs are currently in the midst of administrative reconsideration of their designations and have the opportunity to develop the record and establish in that proceeding any error in the original designation.  *See* Defs.' Opp'n at 23 n.12.  Plaintiffs' disappointment at the speed of their proceedings with the agency is understandable, *see* Pls.' Reply at 5–6, given the substantial harm to them stemming from the SDN designations.  Yet the national security concerns, institutional expertise, and the full contents of what may be a dense, classified administrative record, militates strongly against using the mechanism of a preliminary injunction proceeding to check the work of the State Department and the intelligence agencies on an expedited basis.  As the Supreme Court has noted, "neither the Members of [the Supreme Court] nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people."  *Humanitarian L. Project*, 561 U.S. at 34 (quoting *Boumediene v. Bush*, 553 U.S. 723, 797 (2008)).  The equities are better balanced, and the public interest better served, by allowing the government time to declassify more of the record and allow both litigation and administrative reconsideration to proceed along the normal course.

Plaintiffs are correct that "[t]here is generally no public interest in the perpetuation of unlawful agency action," *League of Women Voters*, 838 F.3d at 12, but they have not established a likelihood of success on the merits.  Rather than making the required showing that the State Department's designations are unlawful, plaintiffs have only illustrated a factual dispute better resolved on a more fulsome record.  In light of the national security interests involved, the equities and public interest do not favor preliminary injunctive relief.

## IV.    CONCLUSION

Having failed to demonstrate either a likelihood of success on the merits or that the

balance of equities and public interest favor preliminary injunctive relief, plaintiffs cannot meet

"the demanding standard for a mandatory preliminary injunction," *Archdiocese of Wash.,* 897

F.3d at 319, of showing that issuance of this relief is warranted.  Accordingly, for the foregoing

reasons, the plaintiffs' Motion for Preliminary Injunction and Expedited Discovery, ECF No. 5,

requesting that enforcement or implementation of defendants' designation of plaintiffs as

Specially Designated Nationals be enjoined, is denied.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  August 12, 2021

_____
BERYL A. HOWELL
Chief Judge